*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0273p.06

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT
_____

TERESA O'BRIEN, *et al*. (No. 07-4553);
JESSICA DELLARUSSIANI, *et al*. (No. 08-3184),

        *Plaintiffs-Appellants,*

      *v.*

ED DONNELLY ENTERPRISES, INC., and ED
DONNELLY,

        *Defendants-Appellees.*

Nos. 07-4553; 08-3184

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
Nos. 04-00085; 07-00253—George C. Smith, District Judge.

Argued: December 2, 2008

Decided and Filed: August 5, 2009

Before: MOORE and WHITE, Circuit Judges; TARNOW, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Lisa A. Wafer, FERRON & ASSOCIATES, Columbus, Ohio, for Appellants. Loriann E. Fuhrer, KEGLER, BROWN, HILL & RITTER, Columbus, Ohio, for Appellees. **ON BRIEF:** Lisa A. Wafer, John W. Ferron, Jessica G. Fallon, FERRON & ASSOCIATES, Columbus, Ohio, for Appellants. Loriann E. Fuhrer, KEGLER, BROWN, HILL & RITTER, Columbus, Ohio, for Appellees.

      TARNOW, D. J., delivered the opinion of the court, in which MOORE, J., joined. WHITE, J. (p. 53), delivered a separate opinion concurring in part.

_____

## OPINION
_____

      ARTHUR J. TARNOW, District Judge.

_____

[*]The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of Michigan, sitting by designation.

I.  Factual and Procedural Background  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

II.  The *Dellarussiani* suit  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
     A.  Considering the offer of judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
     B.  Mootness of counts I and II in view of offer of judgment  . . . . . . . . . . .  8
     C.  Reasonable attorneys' fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
     D.  Liquidated damages under Ohio's Prompt Pay Act . . . . . . . . . . . . . . .  11

III.  Motion to dismiss *Dellarussiani* plaintiffs from *O'Brien* appeal . . . . . . . . . . .  14
     A.  Mootness due to *Dellarussiani* judgment on counts I and II . . . . . . . . .  15
     B.  Defendants' argument that mootness of the FLSA claim necessarily renders
         any supplemental claims moot . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15
     C.  *Res judicata* and the *Dellarussiani* plaintiffs' Prompt Pay Act claim in
         *O'Brien*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18
     D.  *Res judicata* and *Dellarussiani* plaintiffs' common-law claims in *O'Brien*
         . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

IV.  The *O'Brien* suit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21
     A.  Decertification  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21
         1.  Standard of review  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22
         2.  The meaning of "similarly situated" . . . . . . . . . . . . . . . . . . . . . . . .  22
     B.  The lead plaintiffs in *O'Brien*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27
         1.  Spoliation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27
         2.  O'Brien . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29
             a.  *Rogan* deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31
             b.  Deposition in the instant case  . . . . . . . . . . . . . . . . . . . . . .  32
             c.  Affidavit  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36
             d.  Summary Judgment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38
         3.  Prater . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41
             a.  Affidavit ¶¶ 6-9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41
             b.  Affidavit ¶¶ 10-13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43
             c.  Affidavit ¶¶ 15-16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46
             d.  Affidavit ¶ 14; Exhibits 6 and 7  . . . . . . . . . . . . . . . . . . . .  49
             e.  Summary judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  50
         4.  Burden of proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51

V.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  52

These appeals involve two related cases in which former employees of two McDonald's franchises allege that their employer refused to pay the employees the wages that they were due, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b); the corresponding Ohio statute; and other Ohio law. For the reasons

that follow, in the *Dellarussiani* appeal, we affirm the district court's entry of judgment pursuant to the defendants' Fed. R. Civ. P. 68 offer of judgment, except that the issue of attorney fees is remanded to the district court.   Having achieved all the relief that they could hope to get on their most important claims, the *Dellarussiani* plaintiffs no longer have a stake in these claims in the *O'Brien* case.  As for an Ohio Prompt Pay Act claim, which plaintiffs lost in *Dellarussiani* on summary judgment, and as to common-law claims pleaded in *O'Brien* but not in *Dellarussiani*, the appeal is not moot, though these claims will be barred by *res judicata*.   Therefore, defendants' motion to dismiss the *Dellarussiani* plaintiffs from the *O'Brien* appeal is granted in part, but denied in part as to the Prompt Pay Act and common-law claims.  Though we disagree with the standard that the district court applied in deciding whether the *O'Brien* plaintiffs were "similarly situated" under the FLSA, we affirm the decertification.  We do so, because in view of our dismissal of most of the *Dellarussiani* plaintiffs' claims from the *O'Brien* appeal, there is only one possible opt-in plaintiff who could join the lead plaintiffs in *O'Brien*. But the district court correctly observed that this particular opt-in plaintiff failed to allege that she suffered from any unlawful practices.  She is clearly not similarly situated to the lead plaintiffs.  Nor are the *Dellarussiani* plaintiffs, who have only a few extant supplemental claims, similarly situated to the lead plaintiffs, given that these claims will inevitably be barred by *res judicata*.   Therefore, we affirm the district court's decertification of the collective action.  That leaves the claims of the lead *O'Brien* plaintiffs.  As to the lead plaintiffs, we reverse the district court's grant of summary judgment in defendants' favor as to the lead plaintiffs' "off the clock" claims and vacate the grant of summary judgment as to the lead plaintiffs' claim that their time-sheets were improperly altered.

*I. Factual and Procedural Background*

The defendants in this case are Ed Donnelly and the corporation that he and his wife own, Ed Donnelly Enterprises, Inc. *O'Brien* J.A. 150. Defendants bought two McDonald's stores in Bellefontaine, Ohio in February 2002. *O'Brien* J.A. 155.

For varying lengths of time between 2002 and 2004, plaintiffs worked in at least one of these two stores. They earned wages between $6.25 and $9.00 per hour. *O'Brien* Appellants' Br. at 7.

Plaintiffs allege that there were two main ways in which defendants and their managers paid plaintiffs less than what they had earned. The first practice involved requiring plaintiffs to work "off the clock," that is, before they had punched into, or after they had punched out of, the computerized system that tracked employees' start, end, and break times.

The second manner in which plaintiffs claim they were cheated is this: plaintiffs say that defendants electronically altered the times that had previously been entered by the timekeeping system when an employee punched in or out of work. These edits, according to plaintiffs, reduced the total number of hours recorded in the employees' payroll reports to a number less than what the employees had actually worked.[1]

In *O'Brien v. Ed Donnelly Enterprises, Inc., and Ed Donnelly*, plaintiffs brought the following claims: the first cause of action was for violations of the FLSA; the second, for violations of Ohio's corresponding wage-payment law, O.R.C. § 4111; the third, for violations of Ohio's Prompt Pay Act, O.R.C. § 4113.15(B); the fourth, for fraud; the fifth, for breach of contract; and the sixth, for promissory estoppel.

The district court initially certified a class of plaintiffs under the FLSA. The ultimate class of plaintiffs (two lead plaintiffs and eight opt-in plaintiffs) moved for

---

[1]Through the same counsel who represent the *O'Brien* and *Dellarussiani* plaintiffs, employees at these same two McDonald's restaurants had sued the former owner in October 2001. The employees alleged that employee time records had been improperly edited in violation of the FLSA. *See O'Brien* Resp. Br. at 2; *O'Brien* Reply Br. at 7.

sanctions against defendants for spoliation of evidence. This request was denied. After discovery, the district court found that the opt-in plaintiffs were not similarly situated and decertified the class, dismissing the eight opt-in plaintiffs without prejudice. All plaintiffs but one appealed the decertification order, and this appeal is before this court. Retaining the same counsel as used in the *O'Brien* action, six opt-in plaintiffs refiled individual suits, which were consolidated as *Dellarussiani v. Ed Donnelly Enterprises, Inc., and Ed Donnelly*. Stevie LeVan, another opt-in plaintiff, did not file an individual action, but joins the *O'Brien* appeal.

The two lead plaintiffs in *O'Brien* proceeded individually in that case. After striking several affidavits as inconsistent with prior deposition testimony, the district court granted summary judgment in favor of the defendants against both plaintiffs. The two *O'Brien* plaintiffs appealed this final judgment and several of the evidentiary decisions made by the district court. This appeal is also before this court.

Each of the *Dellarussiani* plaintiffs filed a three-count complaint. Count I claimed violations of the FLSA; count II claimed violations of the corresponding Ohio statute; and count III alleged that defendants were required to pay liquidated damages under Ohio law, separate from any FLSA damages. Defendants made an offer of judgment pursuant to Fed. R. Civ. P. 68 with regard to counts I and II. Defendants offered to pay $6,142.20 (the full amount of claimed damages for counts I and II) plus reasonable attorney fees as determined by the district court. The offer allowed the district court to decide count III on the merits. The *Dellarussiani* plaintiffs rejected the offer; however, the district court found that defendants' offer of judgment mooted counts I and II. The district court entered judgment in favor of the *Dellarussiani* plaintiffs in the amount of the offer on counts I and II.

The district court also determined reasonable attorney fees and costs to be $6,024.94. In making this determination, the district court found that the bills submitted by the *Dellarussiani* plaintiffs' counsel included time spent both on the unsuccessful *O'Brien* case and the successful *Dellarussiani* case. In addition, the bills did not

properly explain what expenses were incurred in preparation solely for *Dellarussiani*. The district court awarded attorney fees and costs only for the work it determined was done solely for the *Dellarussiani* action, even though some of the evidence used in *Dellarussiani* was gathered during the *O'Brien* action.

Regarding count III, the district court granted defendants' motion for summary judgment, finding that the wages in question were in dispute. According to the district court, under Ohio Rev. Code § 4113.15(B), if wages are in dispute, an employer is not liable for liquidated damages. The *Dellarussiani* plaintiffs appealed the district court's entry of judgment on counts I and II, the attorney-fees award, and the grant of summary judgment on count III. Defendants filed a motion with this court to dismiss the *Dellarussiani* plaintiffs from the *O'Brien* appeal, asserting that the *Dellarussiani* plaintiffs' claims in *O'Brien* were mooted by the district court's entry of judgment in the *Dellarussiani* plaintiffs' favor.

## II. The Dellarussiani *suit*

The six *Dellarussiani* plaintiffs contend that the district court erred (1) when it considered defendants' offer of judgment, (2) when it dismissed counts I and II of their complaint for mootness in view of the offer of judgment, (3) when it refused to award any attorneys' fees that were incurred in *O'Brien* while prosecuting the *Dellarussiani* plaintiffs' claims, and (4) when it granted summary judgment in defendants' favor on count III. We affirm the district court's disposition of these issues, except as to the award of attorney fees.

### A. *Considering the offer of judgment*

Plaintiffs maintain that the district court abused its discretion by even considering the offer of judgment, because Fed. R. Civ. P. 68(b) states that "[e]vidence of an unaccepted offer is not admissible except in a proceeding to determine costs."

The district court considered the offer of judgment on defendants' Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction. Both the district court and the

defendants explain that a district court can consider an offer of judgment to determine whether a claim is moot, in order to ascertain whether there is a justiciable case or controversy under Article III of the Constitution. In other words, an offer of judgment cannot be used to support or challenge the merits of a claim and to thereby influence the trier of fact. *See Hopper v. Euclid Manor Nursing Home*, 867 F.2d 291, 295 (6th Cir. 1989) ("The rule contemplates that whether jury or judge tries the case the decisionmaker will be unaware of the extraneous fact that an offer of judgment has been made. This ensures that the trier of fact will not be influenced in its evaluation of the case by any knowledge of a rejected offer or the consequences thereof."). But a Rule 68 offer can be used to show that the court lacks subject-matter jurisdiction. *See Greisz v. Household Bank (Ill.), N.A.*, 176 F.3d 1012, 1015 (7th Cir. 1999) (an offer of judgment that encompasses the relief claimed "eliminates a legal dispute upon which federal jurisdiction can be based," because "[y]ou cannot persist in suing after you've won"); *cf. Drs. Hill & Thomas Co. v. U.S.*, 392 F.2d 204 (6th Cir. 1968) (government offered, though not pursuant to Rule 68, to give more money to tax-refund claimant than was claimed and district court correctly dismissed the claim as moot).

We agree with the Seventh Circuit's view that an offer of judgment that satisfies a plaintiff's entire demand moots the case and reject the plaintiffs' contention that the offer of judgment could not be considered. We also note that our decision does not implicate *Sandoz v. Cingular Wireless LLC*, 553 F.3d 913, 922 (5th Cir. 2008). That court held that a Rule 68 offer of judgment cannot moot a lead plaintiff's FLSA claim when the lead plaintiff timely moves for collective certification, because the motion relates back to the lead plaintiff's filing of the complaint. Of course, if the court eventually denies the motion, then the lead plaintiff represents only herself, and her claim is moot. Contrary to the *Sandoz* plaintiff, the *Dellarussiani* plaintiffs did not purport to bring a collective action, so we are not concerned that the *Dellarussiani* plaintiffs have been picked off by defendants to avoid the onslaught of a putative collective action.

We disagree, however, with the Seventh Circuit's view that a plaintiff loses outright when he refuses an offer of judgment that would satisfy his entire demand. *See Greisz*, 176 F.3d at 1015 (barring recovery of any damages or attorney fees when the plaintiff refused an offer of judgment for the full amount of damages plus reasonable costs and attorney fees). Instead, we believe the better approach is to enter judgment in favor of the plaintiffs in accordance with the defendants' Rule 68 offer of judgment, as the district court did in this case, following the lead of district courts in the Second Circuit. *See Greif v. Wilson, Elser, Moskowitz, Edelman & Dicker LLP*, 258 F. Supp. 2d 157, 160-61 (E.D.N.Y. 2003); *Ambalu v. Rosenblatt*, 194 F.R.D. 451, 453 (E.D.N.Y. 2000).

### B. Mootness of counts I and II in view of offer of judgment

Plaintiffs maintain that the district court erred in dismissing counts I and II for mootness. In particular, plaintiffs argue that the defendants' offer of judgment did not include attorneys' fees and costs.

True, the defendants' offer did not offer a number certain for plaintiffs' attorneys' fees. But the defendants did offer to pay costs accrued and a reasonable attorneys' fee to be determined by the court. *Dellarussiani* J.A. 281. Plaintiffs do not argue that they could have obtained anything more for their substantive claims in counts I and II than what the defendants offered. The only issue is whether an offer of judgment which offers to pay a reasonable attorneys' fee as later determined by the court — but which does not offer to pay whatever sum reported by opposing counsel — moots the FLSA and corresponding Ohio claim in this case.

The district court noted that offers of judgment with language similar to defendants' offer have been deemed by other district courts sufficient to moot the claims at issue. *See Ambalu*, 194 F.R.D. at 452; *see also Greisz*, 176 F.3d at 1014 (defendant who offered judgment of "$1,200 plus reasonable costs and attorneys' fees" in a Truth in Lending Act case was "offering [plaintiff] more than her claim was worth to her in a pecuniary sense"). Furthermore, the FLSA does not entitle a prevailing plaintiffs'

counsel to get whatever fee counsel claims. Rather, under the statute, the "court . . . shall . . . allow a reasonable attorney's fee." 29 U.S.C. § 216(b). Defendants' offer to pay the reasonable attorneys' fee as determined by the court is consonant with the statutory language which requires that the court "allow" the reasonable fee when it awards a judgment to a FLSA plaintiff.

Plaintiffs also contend that the offer did not purport to satisfy plaintiffs' claim for liquidated damages under Ohio Revised Code § 4113.15(B). However, the offer was only extended as to counts I and II. *Dellarussiani* J.A. 281. Count III, which entailed plaintiffs' claim to liquidated damages under Ohio law, proceeded to summary judgment. *See infra* Part II.D.

Therefore, the district did not err when it dismissed counts I and II as moot in view of the offer of judgment.

### C.  Reasonable attorneys' fees

Plaintiffs' counsel incurred fees of roughly $6,000 in this case and $150,000 in *O'Brien*. *Dellarussiani* J.A. 42. The district court determined that the reasonable fee to which plaintiffs' counsel were entitled did not include the *O'Brien* fees. *Dellarussiani* J.A. 47. We review under an abuse-of-discretion standard. *Wells v. New Cherokee Corp.*, 58 F.3d 233, 239 (6th Cir. 1995).

Plaintiffs contend that the *Dellarussiani* plaintiffs' claims were prosecuted primarily in *O'Brien*. But the district court and defendants reason that the statute authorizes an award of fees only in "the action" where a plaintiff prevails. 29 U.S.C. § 216(b) ("The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of *the action*.") (emphasis added); *Dellarussiani* J.A. 44. The plaintiffs did not prevail in *O'Brien*, and therefore, say defendants, any fees incurred in *O'Brien* cannot be awarded.

Such a wooden reading of the statute is unnecessary, and at a different point in the district court's opinion, the court appears to acknowledge this. *See Dellarussiani* J.A. 46 (district court expressing difficulty in determining "how much time was spent on tasks in the *O'Brien* matter that were necessary, not redundant, and contributory to the success of the six plaintiffs" on counts I and II of *Dellarussiani*). The reality is that discovery concerning the *Dellarussiani* plaintiffs' claims took place in *O'Brien*. Expenses that plaintiffs' counsel incurred while trying to obtain collective-action certification in *O'Brien* should not be attributed to prosecution of the *Dellarussiani* plaintiffs' particular claims, unless these expenses benefitted the *Dellarussiani* plaintiffs' individual claims. For instance, fees for depositions in *O'Brien* that uncovered the facts surrounding the *Dellarussiani* plaintiffs' claims, even if the depositions were conducted as part of the *O'Brien* plaintiffs' effort to obtain collective-action certification, should not be rejected on the basis of the FLSA.

Consonant with our conclusion that the statute does not bar the district court from awarding attorney fees incurred in the *O'Brien* suit for the *Dellarussiani* plaintiffs' claims, the proper amount of attorney fees is an issue remanded to the district court. We do so notwithstanding the inadequacy and perhaps even the impropriety in the billing records that plaintiffs' counsel had originally presented to the district court. The plaintiffs can have one more opportunity to present records that reflect fees incurred in pursuit of and which benefitted the *Dellarussiani* plaintiffs' claims on which they prevailed pursuant to the Rule 68 offers that included reasonable attorney fees.

Plaintiffs are advised, however, that *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983) does not entitle them to the entirety of their fees incurred in *O'Brien*. As we explained in *Imwalle v. Reliance Medical Products, Inc.*, 515 F.3d 531, 554–55 (6th Cir. 2008), *Hensley* held that a prevailing plaintiff's lodestar amount — that is, the hours expended multiplied by the hourly billing rate — cannot be reduced for lack of overall success if some claims were successful and others were unsuccessful, when all of those claims "are based on a common core of facts or are based on related legal theories." *Imwalle*, 515 F.3d at 554. *Hensley* does not mean that all of the fees in *O'Brien* can be

recouped, even if *arguendo* the claims of all of the *O'Brien* plaintiffs, including those who splintered off to *Dellarussiani*, were based on a "common core of facts."

Addressing some of defendants' concerns, we note that, absent a specific showing of benefit to the *Dellarussiani* plaintiffs, fees cannot be recovered for expenses incurred for the claims of *O'Brien* plaintiffs who did not file suit in *Dellarussiani*, nor for the claims of the lead plaintiffs in *O'Brien* who remained after the collective action was decertified.

### D. *Liquidated damages under Ohio's Prompt Pay Act*

Count III of the *Dellarussiani* complaint sought liquidated damages available under Ohio Revised Code § 4113.15(B), also known as the Prompt Pay Act or the Prompt Payment Act, which states:

> Where wages remain unpaid for thirty days beyond the regularly scheduled payday or, in the case where no regularly scheduled payday is applicable, for sixty days beyond the filing by the employee of a claim or for sixty days beyond the date of the agreement, award, or other act making wages payable *and no* contest[,] court order or *dispute* of any wage claim including the assertion of a counterclaim *exists accounting for nonpayment*, the employer, in addition, as liquidated damages, is liable to the employee in an amount equal to six per cent of the amount of the claim still unpaid and not in contest or disputed or two hundred dollars, whichever is greater.

(Emphasis added).[2] The district court found that disputes accounting for nonpayment of the wages claimed by plaintiffs did exist and that therefore as a matter of law, plaintiffs could not receive liquidated damages. *See Dellarussiani* J.A. 28. So the trial court granted the employer's motion for summary judgment on count III. We agree.

The district court correctly reasoned that Ohio law requires that a dispute accounting for nonpayment precludes the award of liquidated damages to a wage

---

[2]Although the statute says that a claimant may be entitled to 6 % of the unpaid claim, plaintiffs claimed roughly $12,000 in Ohio liquidated damages compared to the roughly $6,000 they sought in counts I and II. *See Dellarussiani* Resp. Br. at 6. At oral argument, defendants' counsel explained that the $12,000 figure was tallied by adding $200 for each alleged violation.

claimant. *See, e.g., Jones v. Select Indus. Corp.*, 2006 WL 1705201, at *6 (S.D. Ohio 2006) ("where the employer disputes the wage claim, no liquidated damages are due"). Plaintiffs contend that there was no dispute in this case, because the employer never informed its employees that the employer was disputing the employees' entitlement to certain wages. *Dellarussiani* Appellants' Br. at 36. But the statute does not require such interaction between an employer and an employee. And even though the cases cited by defendants involve situations where an employer had to decide whether wages were due as a matter of policy, nothing in the statute limits a dispute accounting for nonpayment to such situations. *See Fridrich v. Seuffert Construction Co., Inc.*, 2006 WL 562156, at *4 (Ohio Ct. App. 2006) (deciding that "dispute existed as to whether Seuffert Construction's vacation policy required the payout for unused vacation days"); *Haines & Company, Inc. v. Stewart*, 2001 WL 166465, at *3 (Ohio Ct. App. 2001) (holding that where parties disputed whether certain commissions were "wages" under Prompt Pay Act, a "contest" existed, meaning no liquidated damages were available). We see no reason why a factual dispute over the hours worked could not suffice as a dispute accounting for nonpayment.

Next, plaintiffs suggest that the district court's broad interpretation of what constitutes a dispute allows any recalcitrant employer to reflexively invoke the safe harbor that a dispute existed. *Dellarussiani* Reply Br. at 9.[3] That, according to plaintiffs, would render as surplus the statute's provision of liquidated damages.

But there could be situations where, under the district court's interpretation of the statute, the liquidated-damages provision could come into play. Suppose an

---

[3]Plaintiffs cite *Twaddle v. RKE Trucking Co.*, 2006 WL 840388 (S.D. Ohio 2006) as an instance where a trial court ruled that liquidated damages under O.R.C. 4113.15(B) are available, even though defendants disputed liability on certain claims. *Twaddle*, at *13, *2. *Twaddle*'s analysis of liquidated damages under Ohio law was truncated. The court thought it was for the trier of fact to decide whether the defendant employer could show it acted with "good faith." A showing of good faith would allow the employer to avoid liquidated damages under FLSA. *See* 29 U.S.C. § 260 ("if the employer shows to the satisfaction of the court that the act or omission giving rise to such action [under § 216(b)] *was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation* of the [FLSA], the court may, in its sound discretion, award no liquidated damages" or limit liquidated damages") (emphasis added). However, O.R.C. 4113.15(B) does not contain this language about good faith or reasonable grounds. It is not self-evident that FLSA law on liquidated damages should control the interpretation of a "dispute . . . accounting for nonpayment" under Ohio statute.

employer had promised to pay a certain sum, and the employees agreed that this sum was their due wage. However, a clerical glitch prevented the sum from being delivered to the employees. In such a situation, the employer could not reasonably maintain that a "dispute" accounted for nonpayment. Likewise, if an employer were short on incoming cash, and consequently had to delay paying its employees, but conceded the employees' entitlement to payment, the employer could not reasonably argue that a "dispute" accounted for nonpayment. Further, because application of the statute's safe harbor requires that there be a contest, court order, or dispute of a wage claim accounting for nonpayment, it is proper to focus on whether the asserted dispute accounts for the nonpayment. Thus, it is not the case that any recalcitrant employer can simply declare that there is a dispute and then retroactively insulate its actions.

Concerning *Dellarussiani*, the defendants disputed that they owed anything more than what they paid their employees according to the employer's own payroll records. Contrary to plaintiffs' argument, the offer of judgment does not undermine the existence of a dispute accounting for nonpayment, because the Rule 68 offer did not concede liability; it was a procedural tool to encourage the quick resolution of litigation. *Dellarussiani* J.A. 281–82.

Plaintiffs suggest that a jury decide whether a dispute existed. *Dellarussiani* Appellants' Br. at 36. However, plaintiffs have failed to raise a genuine issue of material fact, as required under Rule 56, as to whether defendants' disputes with the plaintiffs count as "dispute[s]" under the statute. The district court examined the facts surrounding each of the plaintiffs' claims and concluded that a dispute accounting for nonpayment did indeed exist. *Dellarussiani* J.A. 32–38. The district court framed its inquiry as one determining whether the evidence demonstrated "a reasonable basis upon which Defendants disputed" the plaintiffs' claims. Although asking whether the defendant has a "reasonable basis" for disputing the claims does not flow directly from O.R.C. § 4113.15(B), the district court's "reasonable basis" gloss aided its consideration of whether there was a genuine issue regarding whether there was a contest or dispute "accounting for nonpayment." Plaintiffs have not shown that the district court erred

in concluding as a matter of law that there was no genuine issue of material fact whether there was a contest or dispute accounting for nonpayment. Even if plaintiffs may have provided evidence creating an issue of fact as to whether the underlying FLSA and wage-payment violations occurred, that evidence, even when viewed most favorably towards plaintiffs, does not suggest that there was no dispute accounting for nonpayment. Rather, the evidence, even when viewed in the required light, establishes that a contest or dispute regarding defendant's liability for further wages accounted for its nonpayment.

Alternatively, if plaintiffs had evidence that the wages were withheld even though defendants conceded or reasonably had to concede that the wages were due, such evidence — like evidence about clerical glitches or cash-flow problems — could create a triable issue of fact on the Prompt Pay Act claim. But in our case, the plaintiffs have no such evidence: the reason that the lawsuit has continued is that defendants do not concede that the wages claimed by plaintiffs are due. Therefore, the district correctly granted summary judgment in defendants' favor on count III.

### III. *Motion to dismiss* Dellarussiani *plaintiffs from* O'Brien *appeal*

Arguing that we lack subject-matter jurisdiction due to mootness, defendants move to dismiss from the *O'Brien* appeal the plaintiffs who splintered off from the *O'Brien* case following decertification so that they could file individual claims in *Dellarussiani*. The motion is granted in part and denied in part. We explain why in four parts: (A) mootness due to *Dellarussiani* judgment on counts I and II; (B) defendants' argument that mootness of the FLSA claim necessarily renders any supplemental claims moot; (C) the hurdle of *res judicata* for the *Dellarussiani* plaintiffs' Prompt Pay Act claim in *O'Brien*; (D) and the *res judicata* bar against the common-law claims that *Dellarussiani* plaintiffs have in *O'Brien*.

*A. Mootness due to* Dellarussiani *judgment on counts I and II*

Because we affirm the district court's entry of judgment in the *Dellarussiani* plaintiffs' favor on counts I and II, any of the plaintiffs' corresponding claims in *O'Brien* — claims that they hope to maintain if the district court's decertification is reversed on appeal — are now moot. There is no longer a live controversy as to the FLSA and the corresponding Ohio wage-payment claim, *Gottfried v. Med. Planning Servs., Inc.*, 280 F.3d 684, 691 (6th Cir. 2002), because there is no other relief that plaintiffs could obtain on those claims in *O'Brien*, given our overall affirmance of the district court's rulings in *Dellarussiani* and our remand of the attorney-fees issue in *Dellarussiani*.

*B. Defendants' argument that mootness of the FLSA claim necessarily renders any supplemental claims moot*

Defendants suggest that our inquiry stops here, because the only claim in *O'Brien* that is statutorily capable of proceeding collectively is the FLSA claim. Appellees' Reply in Supp. of Mot. to Dismiss at 3. Given that the FLSA claim that the *Dellarussiani* plaintiffs had in *O'Brien* has been mooted by the judgment entered in *Dellarussiani* pursuant to the Rule 68 offer, the collective-action device is unavailable, according to defendants' theory, for the *Dellarussiani* plaintiffs' supplemental claims that remain in *O'Brien*. Defendants maintain that because the *Dellarussiani* plaintiffs' appeal in *O'Brien* seeks reinstatement into a collective action, the unavailability of this vehicle means that their appeal is moot.

We reject this argument. In general, as we discuss in Part IV.A, if a FLSA lead plaintiff also brings supplemental state claims and then seeks certification as a collective action, a district court evaluates whether the opt-in plaintiffs are "similarly situated" under 29 U.S.C. § 216(b). If the opt-in plaintiffs are similarly situated to the lead plaintiffs, it does not make sense to suggest, as defendants seem to, that only the FLSA claims may proceed collectively, while the supplemental claims would have to proceed individually or would be required to run in parallel to the collective action only by satisfying the more stringent requirements of Fed. R. Civ. P. 23. *See, e.g., Molina v.*

*First Line Solutions*, 566 F. Supp. 2d 770, 789–90 (N.D. Ill. 2007) (declining to certify a parallel Fed. R. Civ. P. 23(b)(3) class of supplemental claims alongside a FLSA collective action, but allowing any opt-in plaintiffs to pursue supplemental claims as part of a collective action). To disjoin FLSA and supplemental claims in the manner proposed by defendants would defeat the purpose of supplemental jurisdiction, which is to facilitate the resolution of claims that are so closely related to claims for which federal jurisdiction originally lies that the supplemental claims are part of the same case or controversy as the claim independently invoking federal jurisdiction. *See* 13D Wright, Miller, Cooper, & Freer, *Federal Practice and Procedure* § 3657 at 317 n.4 (3d ed. 2008). Notwithstanding the lack of express statutory authority in the FLSA for collective certification of non-FLSA claims, supplemental claims by definition are treated as part of the same controversy animated by a particular employee's FLSA claim. *See* 28 U.S.C. § 1367(a).

So far, we have explained that an opt-in employee with FLSA and supplemental claims can have both of those claims certified as part of a collective action where a lead plaintiff has FLSA and supplemental claims. That is the background for the situation we face, where a lead plaintiff has FLSA and supplemental claims, but an opt-in employee only has supplemental claims.

In *Exxon Mobil Corp. v. Allapattah Services*, Justice Ginsburg explained the Court's unanimous understanding that 28 U.S.C. § 1367(a) confers supplemental jurisdiction in cases where one plaintiff has a claim invoking federal-question jurisdiction, 28 U.S.C. § 1331, but other plaintiffs only have state claims. 545 U.S. 546, 587–88 (2005) (Ginsburg, J., dissenting); *see id.* at 559 (majority opinion) ("If the court has original jurisdiction over a single claim in the complaint, it has original jurisdiction over a 'civil action' within the meaning of §1367(a), even if the civil action over which it has jurisdiction comprises fewer claims than were included in the complaint. Once the court determines it has original jurisdiction over the civil action, it can turn to the question whether it has a constitutional and statutory basis for exercising supplemental jurisdiction over the other claims in the action."); *see also Lindsay v. Gov't Employees*

*Ins. Co.*, 448 F.3d 416, 423 (D.C. Cir. 2006) (analyzing *Allapattah* and holding in a case involving FLSA and state-law claims that "so long as the district court has original jurisdiction over a single claim, it may exercise supplemental jurisdiction over any additional claim that forms part of the same Article III case or controversy"). Under *Allapattah*, § 1367(a)'s requirement that the section only apply "in any civil action of which the district courts have original jurisdiction" is clearly satisfied when a single claim invoking federal-question jurisdiction exists. Thus, an inquiry whether supplemental jurisdiction exists over state-law claims need only examine whether the state claims are so closely related to the federal claim that the state claims form part of the same Article III case or controversy as the federal claim.

Therefore, as long as someone in a collective action has a FLSA claim, employees who are similarly situated can be part of the collective action, even if the other employees only have supplemental claims. Accordingly, if for some reason, a particular employee or group of employees did not have viable FLSA claims, due to mootness or claim preclusion, for instance, but had extant supplemental claims, a court would examine whether these employees were still similarly situated to the lead plaintiffs, which they may or may not be.

The short of our discussion is that we have jurisdiction to consider whether the *Dellarussiani* plaintiffs, who have only supplemental claims that are still alive, could still be part of the collective action, were we to remand the case for recertification. Even though the *Dellarussiani* plaintiffs' FLSA claim in *O'Brien* is now moot due to the *Dellarussiani* judgment, the FLSA only requires an analysis of whether these plaintiffs are similarly situated to the lead plaintiffs whom they would join upon a putative remand for recertification of the collective action. That similarly-situated analysis is not mooted by the lack of a FLSA claim on the part of the employees who seek to opt into the collective action.

*C.*  Res judicata *and the* Dellarussiani *plaintiffs' Prompt Pay Act claim in* O'Brien

We turn therefore to the other supplemental claims.  With respect to the plaintiffs' third claim in *O'Brien* for liquidated damages under Ohio's Prompt Pay Act, O.R.C. § 4113.15(B): In *Dellarussiani*, this claim died on summary judgment, and above, we explain why we affirm the district court's disposition of count III.  But the *Dellarussiani* plaintiffs still have a Prompt Pay Act claim in *O'Brien*.  Mootness typically would not bar the *Dellarussiani* plaintiffs' § 4113.15(B) claim in *O'Brien*, in view of their loss at summary judgment on an identical claim in other litigation. Ordinarily, when a claim has already been resolved in a prior suit, mootness is invoked as a bar to subject-matter jurisdiction when "full relief" has been accorded by the prior tribunal.  *See, e.g., Davis v. Sun Oil Co.*, 148 F.3d 606, 611 n.4 (6th Cir. 1998).  Indeed, this is the case for counts I and II of *Dellarussiani*: plaintiffs have already won on these claims in *Dellarussiani*, and there is nothing more for them to win on a putative remand in *O'Brien*, particularly since we are remanding to the *Dellarussiani* district court the issue of what attorney fees can be recouped.  That is why the *Dellarussiani* plaintiffs' are dismissed from the *O'Brien* appeal as to their FLSA and O.R.C. § 4111 claims.

But with regard to the Prompt Pay Act claim for liquidated damages, the *Dellarussiani* plaintiffs in *O'Brien* are not, strictly speaking, barred by mootness but by claim preclusion.  This fine distinction is worth discussing, because if mootness were to apply when a losing party received an adverse ruling but persisted in seeking relief in a subsequent suit,  a federal court sitting in that subsequent suit would be required to *sua sponte* inquire into its own subject-matter jurisdiction over the previously losing party's claim.  In other words, whether *res judicata* applied would be probative of whether the subsequent claim was moot and whether the claim was justiciable.  But Fed. R. Civ. P. 8(c) clearly frames *res judicata* as an affirmative defense, which means that it can be waived and that it does not go to subject-matter jurisdiction.  *See O'Connor v. Pierson*, 426 F.3d 187, 194 (2d Cir. 2005).   Therefore, losing a claim on summary judgment in a previous suit does not moot such a claim in a subsequent lawsuit.  Rather, the

subsequent claim is barred under the doctrine of claim preclusion. *See Ohio Nat. Life Ins. Co. v. U.S.*, 922 F.2d 320, 325 (6th Cir. 1990).

Under Sixth Circuit Rule 27(d)(1), "[m]otions to dismiss ordinarily may not be filed on grounds other than lack of jurisdiction." This rule favors denying the defendants' motion to dismiss as to the *Dellarussiani* plaintiffs' Prompt Pay Act claim in *O'Brien*, because claim preclusion, not mootness, is the obstacle that plaintiffs face on this claim. The individual *Dellarussiani* plaintiffs could then conceivably be recertified into a collective action along with the lead plaintiffs in *O'Brien*, given our conclusion, which we discuss later in Part IV.A.2, that the district court applied the wrong standard in decertifying the collective action in *O'Brien*. However, on remand, the defendants would surely raise *res judicata* and ask the district court to dismiss the extant *Dellarussiani* plaintiffs' claim once and for all. *Res judicata* in this instance is an "insurmountable hurdle" that has mootness-like effects. *See Myer v. Americo Life, Inc.*, 469 F.3d 731, 733 (8th Cir. 2006).

Rather than grant the defendants' motion to dismiss the *Dellarussiani* plaintiffs' appeal in *O'Brien* as to their Prompt Pay Act claim, we instead choose to avoid transgressing the boundary between mootness and claim preclusion. The motion is denied as to the claim for § 4113.15(B) liquidated damages, but we find that under § 216(b) of the FLSA, the *Dellarussiani* plaintiffs are not "similarly situated" to the lead plaintiffs in *O'Brien*, given the inevitable preclusion of both the Prompt Pay Act claims and the common-law claims, as discussed next in Part III.D. Therefore, on the merits, we affirm the district court's decertification of these plaintiffs' Prompt Pay Act claim. Thus, the *Dellarussiani* plaintiffs are unable to rejoin the collective action. Technically, they could attempt to file individual actions, as we are affirming the district court's decertification and dismissal *without prejudice* of their claim. But such suits would be nipped in the bud by the affirmative defense of claim preclusion.

*D.* Res judicata *and* Dellarussiani *plaintiffs' common-law claims in* O'Brien

Finally, we must consider whether the *Dellarussiani* plaintiffs' appeal from the decertification order in *O'Brien* is moot as to common law claims pleaded in *O'Brien*. Because the FLSA and common-law claims appear to be based on the same alleged conduct, we are skeptical that the district court would afford any more relief upon a putative remand on the common-law claims in *O'Brien* than what the plaintiffs already received on counts I and II pursuant to the offer of judgment in *Dellarussiani*. Nevertheless, we cannot say as a matter of law how the disposition of a FLSA claim affects the common-law claims. That would require an analysis of the elements of and remedies offered by the common-law claims compared to the FLSA claim. It is possible that a federal claim could be moot while a supplemental claim based on the same conduct might not be.

The doctrine that would definitively bar the *Dellarussiani* plaintiffs from pursuing their common-law claims in *O'Brien* upon a putative remand is claim preclusion, not mootness. Therefore, for the reasons discussed in the previous section, we have subject-matter jurisdiction over the *Dellarussiani* plaintiffs' appeal as to the common-law claims, and the motion to dismiss is accordingly denied with respect to these claims.

The plaintiffs pled for common-law relief in *O'Brien*, but not in *Dellarussiani*. *See O'Brien* J.A. 11–14; *Dellarussiani* J.A. 4–6. Because the district court dismissed the *Dellarussiani* plaintiffs from *O'Brien* without prejudice, the *Dellarussiani* plaintiffs could have brought the common-law claims in *Dellarussiani*. But they did not. Therefore, they will inevitably be barred by *res judicata*. We affirm the decertification in *O'Brien* as to the *Dellarussiani* plaintiffs: they are not similarly situated under the FLSA to the lead plaintiffs, because they will not have any claims grounded in the actionable conduct. They have nothing left to litigate in *O'Brien*, as all of their claims in *O'Brien* are moot or will be claim-precluded.

*IV. The* O'Brien *suit*

Therefore, only the two lead *O'Brien* plaintiffs and Stevie LeVan are now parties to the appeal from the *O'Brien* district court's decertification order. After we discuss why the district court's application of the "similarly situated" language from the FLSA was partly in error, we explain why the district court's decertification of the collective action will be affirmed. We then discuss the district court's evidentiary and summary-judgment rulings concerning the two lead *O'Brien* plaintiffs.

*A. Decertification*

The Fair Labor Standards Act provides a private cause of action against an employer "by any one or more employees for and in behalf of himself or themselves *and other employees similarly situated*." 29 U.S.C. § 216(b) (emphasis added).

Unlike class actions under Fed. R. Civ. P. 23, collective actions under FLSA require putative class members to opt into the class. *See* 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."). These opt-in employees are party plaintiffs, unlike absent class members in a Rule 23 class action. *See* 7B Wright, Miller, & Kane, *Federal Practice and Procedure* § 1807 at 474 n.13 (3d ed. 2005).

The district court followed a two-stage certification process, as many courts do, to determine whether the opt-in plaintiffs and lead plaintiffs were similarly situated. *See id.* § 1807 at 487 n.48. After the initial conditional certification of the class, the parties entered into discovery. At the second stage, the district court reviewed the evidence produced during discovery and decertified the class for two main reasons. First, the district court stated that each claim presented by each plaintiff would require an extensive individualized analysis to determine whether a FLSA violation had occurred, frustrating the "collective consideration of common questions of fact and law." *O'Brien* J.A. 72. Second, the alleged violations were not based on a broadly applied, common

scheme, nor were the violations widespread even among the plaintiffs, who constituted only a small fraction of the total number of potential collective-action members. *See* J.A. 69. Specifically, out of the 426 potential collective-action members, the district court noted that evidence produced through discovery revealed that only five of the ten plaintiffs alleged that their time-sheets were altered, only five alleged that they were required to work off the clock, and three plaintiffs failed to allege that they suffered from either practice. *Id.*

### 1. *Standard of review*

The Sixth Circuit has not previously announced its standard for reviewing a district court's certification rulings in the FLSA context. But the Eleventh Circuit reviews collective-action–certification decisions for abuse of discretion, and even the plaintiffs suggest that the court apply this deferential standard. *See Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953–54 (11th Cir. 2007). We adopt this standard.

### 2. *The meaning of "similarly situated"*

The Fair Labor Standards Act does not define "similarly situated," and neither has this court. However, district courts have based their final-certification decisions on a variety of factors, including the "factual and employment settings of the individual[] plaintiffs, the different defenses to which the plaintiffs may be subject on an individual basis, [and] the degree of fairness and procedural impact of certifying the action as a collective action." *See* 7B Wright, Miller, & Kane, *supra*, § 1807 n.65 at 497; *Anderson*, *supra*, 488 F.3d at 953 . The lead plaintiffs bear the burden of showing that the opt-in plaintiffs are similarly situated to the lead plaintiffs. *See* 7B Wright, Miller, and Kane, *supra*, § 1807 at 476 n.21. Showing a "unified policy" of violations is not required, though. *See Grayson v. K Mart Corp.*, 79 F.3d 1086, 1095 (11th Cir. 1996) (suit alleging age discrimination under Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–34, which incorporates by reference the enforcement provisions of the FLSA). *But see Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1214 n. 8 (5th Cir.1995) (for conditional certification so that notice to putative class members could be sent, court

required that plaintiffs allege that they were victims of a single decision, policy, or plan infected by discrimination), *overruled on other grounds by Desert Palace, Inc., v. Costa*, 539 U.S. 90 (2003); *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1105 (10th Cir. 2001) (same).

Plaintiffs argue that they did indeed allege two common ways by which the employer violated the FLSA, namely, (1) that the defendant made employees work off the clock, and (2) that the employer or its agents improperly edited employees' time punches after the fact, thus cutting the hours for which plaintiffs were paid. Both the district court and the defendant note that to determine whether a particular violation of the FLSA took place in this case requires an individualized analysis that examines the facts of each alleged violation. For this reason, the district court decertified, determining that individualized issues predominated.

But such a collection of individualized analyses is required of the district court. Under the FLSA, opt-in plaintiffs only need to be "similarly situated." While Congress could have imported the more stringent criteria for class certification under Fed. R. Civ. P. 23, it has not done so in the FLSA. *See Grayson*, 79 F.3d at 1096 (section 216(b)'s "similarly situated" requirement is less stringent than Rule 20(a) requirement that claims "arise out of the same action or occurrence" for joinder to be proper, or even Rule 23(b)(3)'s requirement that common questions predominate for a 23(b)(3) class to be certified). *But see Shushan v. Univ. of Colo. at Boulder*, 132 F.R.D. 263, 266–67 (D. Colo. 1990) (applying Rule 23 to collective actions under 216(b) for purpose of effective management of litigation). The district court implicitly and improperly applied a Rule 23–type analysis when it reasoned that the plaintiffs were not similarly situated because individualized questions predominated. *See O'Brien* J.A. 70. This is a more stringent standard than is statutorily required.

Granted, it is clear that plaintiffs are similarly situated when they suffer from a single, FLSA–violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs. In the instant case,

proof of a violation as to one particular plaintiff does not prove that the defendant violated any other plaintiff's rights under the FLSA. Nevertheless, the plaintiffs are "similarly situated" according to § 216(b). Furthermore, it is possible that representative testimony from a subset of plaintiffs could be used to facilitate the presentation of proof of FLSA violations, when such proof would ordinarily be individualized. *See Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1263–65, 1279–80 (11th Cir. 2008) (as amended) (determining that although proof of exemption from FLSA's overtime-pay requirements might appear to be individualized, certain plaintiffs' representative testimony could be used to show exemption's inapplicability, as all plaintiffs in collective action were similarly situated), *petition for cert. filed*, 77 U.S.L.W. 3596 (U.S. Apr. 15, 2009) (No. 08-1287). We do not purport to create comprehensive criteria for informing the similarly-situated analysis. But in this case, the plaintiffs were similarly situated, because their claims were unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct. The claims were unified so, because plaintiffs articulated two common means by which they were allegedly cheated: forcing employees to work off the clock and improperly editing time-sheets. We do not mean to require that all collective actions under § 216(b) be unified by common theories of defendants' statutory violations; however, this is one situation where a group of employees is similarly situated.

Plaintiffs offer their own interpretation of what "similarly situated" means. Instead of arguing that Rule 23(b)(3) predominance should not be a criterion for § 216(b) collection actions, plaintiffs say that putative collective-action members whose "causes of action under the FLSA accrued at about the time and place in the approximate manner of the named plaintiff would be similarly situated" to the lead plaintiffs. *See O'Brien* Appellants' Br. at 20 (citing *Pritchard v. Dent Wizard Intern. Corp.*, 210 F.R.D. 591, 595 (S.D. Ohio 2002)). Defendants explain that those cases cited by plaintiffs arise in situations where a court has to decide whether a certain class of employees is exempt from the FLSA's overtime-pay requirements. Those cases, argue defendants, lend themselves to collective adjudication because common questions predominate. For

instance, a court can easily decide whether all the dent-removal technicians (as in *Pritchard*) are exempt from overtime-pay requirements, without having to examine the specific factual situation of each dent-removal technician.

While we agree with plaintiffs that "about the time and place in the approximate manner" is a starting point for understanding what "similarly situated" means, such an interpretation can result in a standard that is more demanding than what the statute requires, unless one excludes Rule 23 predominance from being an implicit requirement for § 216(b) collective actions. And protecting § 216(b) in this way is what we have outlined above. We do not suggest that aspects of Rule 23 could never be applied to a FLSA collective action. Rather, applying the criterion of predominance undermines the remedial purpose of the collective action device.

As for the argument that the alleged unlawful practices — making employees work off the clock and altering the time-sheets — were not alleged by all of the plaintiffs, this argument ultimately requires us to affirm the decertification. Stevie LeVan is the only opt-in plaintiff who could possibly benefit from the recertification of the collective action. Unlike the *Dellarussiani* plaintiffs, LeVan had opted into *O'Brien* but did not pursue her claim in *Dellarussiani*. As the district court observed, LeVan is clearly not similarly situated to the lead plaintiffs, because she failed to allege that she suffered from either unlawful practice. *O'Brien* J.A. 69 (district-court opinion), 289 (LeVan Dep. at 33). And as we explained in Part II, the *Dellarussiani* plaintiffs cannot be recertified because some of their claims are moot and the others will be claim-precluded, leaving them without any claims to pursue and necessarily excluding them from being "similarly situated" under § 216(b).

In general, though, a district court should examine whether partial decertification is possible, when faced with the situation where a subset of the plaintiffs fail to allege violations of the FLSA. The option of partial certification is important to consider, because it counters the argument that a collective action must be totally decertified if some members are not similarly situated to the others. In general, plaintiffs who are not

similarly situated — for instance, plaintiffs who did not allege suffering under either unlawful practice — could be dismissed while keeping intact a partial class. Plaintiffs who do present evidence that they are similarly situated to the lead plaintiffs should not be barred from the opportunity to be part of a FLSA collective action, because the collective action serves an important remedial purpose. Through it, a plaintiff who has suffered only small monetary harm can join a larger pool of similarly situated plaintiffs. *See Hoffman–La Roche, Inc., v. Sperling*, 493 U.S. 165, 170 (1989). That pool can attract effective counsel who knows that if the plaintiffs prevail, counsel is entitled to a statutorily required reasonable fee as determined by the court.[4] In the age-discrimination context, which also requires that opt-in plaintiffs be similarly situated for certification of a collective action, "Congress has stated its policy that ADEA plaintiffs should have the opportunity to proceed collectively." *See Grayson*, 79 F.3d at 1096. As some district courts have noted, "imposing any additional restrictions from Rule 23 would be contrary to the broad remedial goals" of the FLSA and its sister statutes — such as the Equal Pay Act, 29 U.S.C. § 206(d), and the ADEA, 29 U.S.C. § 626(b) — which incorporate the same statutory language concerning collective actions. *See* 7B Wright, Miller, and Kane, *supra*, § 1807 at 481 n.25, at 468–69 nn.2–3.

A final word on the parties' less persuasive points. Defendants note that some of the plaintiffs were managers and therefore could not be "similarly situated." This is not a compelling argument, because managers could also have been cheated by defendants. Also, in their reply brief, plaintiffs mischaracterize the reasoning of the district court, implying that the district court decertified the class because plaintiffs alleged two ways, instead of one way, in which the plaintiffs suffered violations. As discussed, the district court decertified because it did not see how plaintiffs' claims, even if based on two theories of how the FLSA violations were committed, could be adjudicated but in an individualized manner.

---

[4] *But see Greisz v. Household Bank (Ill.), N.A.*, 176 F.3d 1012, 1013 (7th Cir. 1999) (in Rule 23 context, "[t]he smaller the individual claim, the less incentive the claimant has to police the class lawyer's conduct, and the greater the danger, therefore, that the lawyer will pursue the suit for his own benefit rather than for the benefit of the class.")

### B. *The lead plaintiffs in* O'Brien

Having affirmed the district court's decertification of the collective action, we turn to the claims of the lead plaintiffs in *O'Brien*. The district court denied their motion for sanctions due to spoliation, granted defendants' motions to strike plaintiffs' affidavits, and in the end, granted defendants' motion for summary judgment. We conclude that spoliation may have taken place; therefore, this issue is remanded for the district court's consideration. As for the district court's other evidentiary rulings, the affidavits should not have been stricken. Apart from any consideration of the effect of possible spoliation sanctions on the merits of the lead plaintiffs' claims, we disagree with the district court in part and reverse as to the lead plaintiffs' off-the-clock claims. We vacate the district court's entry of summary judgment on the lead plaintiffs' time-sheet–alteration claims, so that the district court may revisit this disposition once it decides the spoliation issue.

### 1. *Spoliation*

In a motion for discovery sanctions, plaintiffs alleged that the defendants intentionally lost or destroyed some of the Time Punch Change Approval (TPCA) Reports. *O'Brien* J.A. 55. In addition to seeking monetary sanctions, the employees wanted the district court to infer that the missing reports would have been adverse to the employer. *Id.* at 4. These TPCA reports were printed by defendants' computer system at the end of each day, but the computer system itself only held the past 72 days in backup. *O'Brien* J.A. 161–62. Plaintiffs maintain that these reports are the only records that would reveal improper changes made by defendant to the time-sheets punched by the employees. *See O'Brien* J.A. 178–79.

Although a district court's discovery rulings are reviewed for abuse of discretion, *see U.S. v. Guy*, 978 F.2d 934, 938–39 (6th Cir. 1992), we reverse the district court and remand for its consideration whether it was reasonably foreseeable that the missing reports would be needed in future litigation.

The magistrate judge's opinion, adopted by the district court, reasons that destruction or loss of evidence before notice of the *O'Brien* lawsuit is not a basis for sanctions. *O'Brien* J.A. 60. That is true, but the issue here concerns *when* the defendant was or should have been on notice that litigation requiring the missing reports as evidence might ensue. *See John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008) (duty to preserve evidence is triggered when a "party has notice that the evidence is relevant to litigation or . . . should have known that the evidence may be relevant to future litigation"). The magistrate judge appears to assume that the defendant was on notice only when the *O'Brien* lawsuit was filed. However, the district court should consider whether the defendants should have been on notice earlier than the date of the filing of the *O'Brien* suit.

As the district court has not yet considered whether the employer was on notice of its duty to preserve evidence before the *O'Brien* lawsuit, we do not conclude in the first instance that spoliation did take place. Rather, the district court can consider facts which could suggest that the employer should have anticipated that the missing records needed to be preserved. For instance, plaintiffs assert that within four to six weeks after buying the McDonald's stores, defendant Donnelly learned that the prior owners had been sued by a former employee who claimed she had not been paid wages due her. *See O'Brien* Reply Br. at 7.[5] Plaintiffs also maintain that Donnelly knew that one of his managers was changing employees' time records by inserting breaks and that one of the managers was making employees work off the clock. *See O'Brien* Reply Br. at 7, 9–10.[6]

If the district court concludes that spoliation did take place, the district court can consider, under its inherent authority, whether it was negligence or bad faith that motivated the defendants and relatedly, what sanction, if any, should be imposed. *Adkins v. Wolever*, 554 F.3d 650, 653 (6th Cir. 2009) (en banc).

---

[5]Although the reply brief cites particular pages of Donnelly's deposition transcript, those pages are not included in the joint appendix or the supplemental appendix.

[6]Here again, the reply brief cites and reproduces excerpts from one Chad Totche's deposition transcript, but those pages are not included in the appendices.

Plaintiffs also argue that the defendants were under a duty to preserve for longer than 72 days the electronic versions of the TPCA reports. *O'Brien* Appellants' Br. at 29. But plaintiffs provide no authority for that proposition. What matters is whether the employer produces the reports in discovery, in either hard copy or electronic form.

Defendants also maintain that they did in fact produce payroll records which show the hours worked. *O'Brien* Resp. Br. at 27. However, the payroll records would not show whether edits were made by defendants to employees' time-sheets. The TPCA reports are therefore relevant to one of plaintiffs' theories of how the alleged FLSA violations happened. Defendants may argue that any edits were made for good reason, *see id.*, but the question of whether the edits were proper is separate from defendants' obligation to produce relevant, non-privileged discovery materials. Finally, defendants argue that of the missing reports, all but two pertain to the time period before the lawsuit was filed. *See O'Brien* Resp. Br. at 26. But as stated above, the district court should consider whether the defendant had a duty to preserve the records even before *O'Brien* was filed.

### 2. O'Brien

Plaintiffs appeal the district court's decision to strike portions of an affidavit that O'Brien filed with her summary-judgment papers because they allegedly conflicted with portions of her prior deposition testimony. The district court based its decision on the rule that "a party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts [her] earlier deposition testimony." *Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1997).

The district court found that O'Brien "*twice* testified that the first thing she did when she walked into the restaurant was clock in." *O'Brien v. Ed Donnelly Enters., Inc.*, No. 2:04-CV-00085, 2007 WL 4510246, at *3 (S.D. Ohio Dec. 18, 2007) (emphasis in the original). The two sources the court looked to were (1) pages 45 and 46 of O'Brien's

deposition testimony in another case, *Rogan v. Ed Donnelly Enterprises*, and (2) O'Brien's deposition in this case. *Id.*

However, plaintiffs pointed out that O'Brien also testified at her deposition in the instant case that O'Brien performed work tasks before clocking in. Defendants' argument as to this was that "the testimony 'was given by O'Brien *after* she had already testified under oath twice to the contrary, *after* consultation with her lawyer, and upon questioning from her own lawyer at her deposition,'" and "that [t]his belated testimony—given with assistance of counsel—is no different from the submission of an inconsistent affidavit." *Id.* (quoting defendants' brief). Faced with O'Brien's subsequent deposition testimony that she worked before clocking in, the court framed the question before it accordingly: "The essential question Plaintiffs' argument poses under [*Reid v. Sears, Roebuck & Co.*, 790 F.2d 453 (6th Cir. 1986)] is whether there is a compelling reason to allow deposition testimony that conflicts with prior testimony, where such conflicting testimony clearly would not be allowed if it were contained in an affidavit." *O'Brien*, 2007 WL 4510246 at *4. The court looked to the purpose behind barring subsequent contradictory affidavits—"screening out sham issues of fact" (quoting *Reid*)—and decided to strike the conflicting portions of the O'Brien affidavit. The court reasoned accordingly:

> In the instant case, Plaintiff O'Brien twice testified — once during deposition in the *Rogan* case, and once during deposition in the instant case — that the first action she took upon arriving at work was clocking in. (Rogan O'Brian Depo. at 45-46; O'Brien Depo. at 37). Plaintiff O'Brien's subsequent testimony that Ed Donnelly told her to clock in half an hour late directly conflicts with her two prior statements. The fact that Plaintiff O'Brien twice stated that she clocked in before starting work, and only once stated that she performed work before clocking in is of only minor importance. It is more than simple arithmetic that convinces this Court that Plaintiff O'Brien's later conflicting testimony should not be allowed. Plaintiff O'Brien's testimony during deposition in the instant case — at a new time, in a new place, in a new action, under circumstances removed from her prior testimony in the *Rogan* case — serves as an independent reaffirmation of the testimony she originally provided during deposition in *Rogan*. It is this entirely consistent reaffirmation of her testimony in *Rogan* that convinces this Court that

> Plaintiff O'Brien's subsequent testimony looks like a discrepancy that creates a "transparent sham" and not a discrepancy that creates "an issue of credibility . . . or go[es] to the weight of the evidence." *Bank of Illinois* at 1169-70. Accordingly, Defendants' Motion to Strike is well-taken with respect to the conflicting portions of the O'Brien Affidavit.

*Id.*

We hold that the district court abused its discretion when it struck portions of O'Brien's affidavit. *See Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 480 (6th Cir.2003) (applying abuse-of-discretion standard to district court's ruling on motion to strike evidentiary submissions). We consider the evidence chronologically — first, the *Rogan* deposition; then, the deposition in the instant case; and finally, the affidavit filed with appellants' summary-judgment papers.

### *a. Rogan deposition*

The district court found that O'Brien's testimony in the instant case was an "independent reaffirmation" of her deposition testimony in the earlier *Rogan v. Ed Donnelly Enterprises, Inc., et al.,* case. The court looked to pages 45–46 of the *Rogan* deposition, where O'Brien testified that her first action upon arriving at work was to clock in. However, the *Rogan* deposition *itself* contains conflicting testimony. A few pages earlier in O'Brien's deposition of April 4, 2005 in *Rogan*, O'Brien testified about the various tasks she would perform when opening the store:

> Q.     . . . Will you explain what you did to open the store; that is, getting in, what you turned on, that sort of thing.
> A.     Oh, boy. It's been a while.
> Q.     I understand.
> A.     Go in, you turn on some nights [sic], because it was dark. The fryer had to be turned on. *Then* you go boot up the computers for the register, the computer for the registers; count the drawers; put the drawers in; turn on the registers.

J.A. 355 (O'Brien *Rogan* Dep. 42) (emphasis added). Thus, at one point in the *Rogan* deposition, O'Brien testified that she would do a series of tasks *before* she turned on the registers.

Shortly thereafter, however — after testifying about those tasks — she was specifically asked about clocking in:

> Q.   How did you clock in in the morning?
> A.   On the cash register.
> Q.   Okay. Did you have to turn it on before you clocked in?
> A.   I believe you could do that when you walked in.
> Q.   Okay.
> A.   *You just had to turn on the register*.
> Q.   Okay. So as you would walk in, you would –
> A.   Clock in your number.
> Q.   – clock in *and then* go about doing the things you described, turning on the computer in the back, the fryer, that sort of thing, correct?
> A.   *Yes.*

J.A. 226-27 (O'Brien *Rogan* Dep. 45–46) (emphasis added).

The district court only cited to the latter portion of O'Brien's deposition in *Rogan*, in which O'Brien testified that she would clock in first. *See O'Brien*, 2007 WL 4510246, at \*3-4 (citing O'Brien Dep. 45-46). Yet, the earlier portion of her *Rogan* testimony indicates the opposite — that O'Brien performed certain tasks *before* turning on the register and clocking in. Therefore, the testimony in the *Rogan* case was internally inconsistent.

### b. Deposition in the instant case

Months later, at the November 21, 2005 deposition in the instant case, opposing counsel read *part* of O'Brien's previous testimony in the *Rogan* case back to her — the part about clocking in — and plaintiff affirmed that it had been transcribed accurately. The following exchange then occurred:

> Q.   So is that the way it would work, that you would go in and then you would *clock in* at the register *and then go about doing the other duties* that you had as opening manager?

> A.     *Yes.* Poke in your number and then – you had to turn on the lights so you could see.
> Q.     Turn on the lights because it's the middle of the night?
> A.     Yes.
> Q.     And then *the first thing you would do is you'd clock in* at the registers, correct?
> A.     *Yes.*
> Q.     So that's the first thing you would do before you'd go on and do the other things?
> A.     You clock in and you turn on the fryer and just keep walking backwards.

J.A. 206-07 (O'Brien Dep. 36-37) (emphasis added). It is clear from this testimony that the first thing O'Brien would do after arriving in the morning, after turning on the lights so that she could see, was clock in — that she would clock in *before* performing her other tasks. Moreover, she testified she "clocked in approximately the same time every day," which was when she "came to work":

> Q.     So you clocked in *at the time that you came to work* and clocked out at the time you left?
> A.     *Yes.*

J.A. 208 (O'Brien Dep. 40) (emphasis added).

However, later in O'Brien's deposition in the instant case, her attorney conducted some direct examination with the stated purpose of "clarify[ing] some testimony from earlier." J.A. 215 (O'Brien Dep. 76). On direct examination — after at least one recess had occurred[7] — the following exchange occurred:

> Q.     You also testified earlier that you would clock in in the mornings when you would come in to work, right?
> A.     Yes.
> Q.     Did you ever perform any work tasks *before* you would actually clock in?
> A.     *Yes.*
> Q.     What work tasks would you perform?

---

[7] *See* J.A. 215 (O'Brien Dep. 76) (noting that a "short recess" was taken right before concluding defendants' portion of the deposition).

A.      Turn on the lights.  *Turn on the fryer, the prep tables, the grill, the oven.  Count – unlock the safe, pull out the register drawers and count the money there, count the safe.  Turn on the computers.  Turn on the computers, you'd clock in, put the drawer – the register drawers in the registers.*

Q.      Is there a – how long would you say it took for you to perform those tasks before clocking in?

A.      About 15 minutes.

Q.      Was there any reason you didn't clock in as soon as you would come into the restaurant in the morning?

A.      *Ed told me not to.*  He said it only took an hour to open the store.  But I knew from working for KCJ.  It took about an hour and a half.  Because if your computers didn't come up, you had to be on the phone with the computer company getting help to bring those up.  Otherwise you had no registers and you had to take your orders by hand and calculate by hand.

J.A. 216-17 (O'Brien Dep. 77-78) (emphasis added).

Later in the deposition, defense counsel resumed their examination of O'Brien. O'Brien testified that the schedule would have her set to come in an hour before the restaurant opened, but she would come in at approximately 4:30 a.m. to have additional time to perform tasks before the restaurant opened:

Q.      And you did that on a volunteer basis?

A.      No.

Q.      Well, Mr. Donnelly told you not to come in until an hour before the restaurant opened, right?

A.      He said it only took an hour to open the restaurant, but it took closer to an hour and a half.

Q.      But your instructions from your employer was to come in an hour before the restaurant opened, right?

A.      *To clock in.*

Q.      Did Mr. – well, *your instruction* was to *come in an hour before the restaurant opened, right?*

A.      *Yes.*

* * *

Q.      *Mr. Donnelly never instructed you to come in an hour and a half before the restaurant opened, correct?*

A.      *Correct.*

* * *

> Q.       [Your manager] Nancy never instructed you to come in an hour and a half before the restaurant opened?
> A.       No.
> Q.       . . . [D]id you ever tell Ed that you were coming into the restaurant more than an hour before?
> A.       I told him that I come in at approximately 4:30 so I could have a good opening and the restaurant would open on time.
> Q.       And is that when he said, no, come in at 5:00?
> A.       He said it only takes an hour to open the store. *And he didn't want me clocking in until closer to 5:00.*
> Q.       He never agreed to pay you for any time more than an hour before the store opened, correct?
> [Objection]
> A.       I don't believe there was an agreement.
> Q.       He never said, I'll pay you for more than an hour before the store opened, correct?
> A.       He only wanted to *pay* for an hour because he thought that's all you needed.  And you did need more.

J.A. 218-20 (O'Brien Dep. 80-82) (emphasis added).

O'Brien's deposition testimony in the instant case, like her deposition testimony in the *Rogan* case, is internally inconsistent.  Admittedly, the more favorable testimony for O'Brien is testimony that her attorney elicited from her after a recess.  The district court was convinced that this was an attempt to create a "sham" issue of fact because O'Brien's initial deposition testimony in the instant case was "an independent reaffirmation of the testimony she originally provided during deposition in *Rogan*." *O'Brien*, 2007 WL 4510246, at \*4.  Indeed, the court concluded, "[i]t is this *entirely consistent reaffirmation* of her testimony in *Rogan* that convinces this Court that Plaintiff O'Brien's subsequent testimony looks like a discrepancy that creates a 'transparent sham' and not a discrepancy that creates 'an issue of credibility . . . or go[es] to the weight of the evidence.'" *Id.* (emphasis added) (quoting *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1169-70 (7th Cir. 1995)).[8]  As shown above, however, the *Rogan* testimony itself was not consistent.  There is no real discrepancy

---

[8]Given such reasoning, it seems doubtful that the district court would have recognized the attempted creation of a sham discrepancy if there had been no *Rogan* deposition at all.

between O'Brien's two depositions. If anything, what the O'Brien testimony in the instant case reaffirms is that her *Rogan* testimony was *likewise* internally inconsistent. That O'Brien could be inconsistent in both her depositions regarding this subject may indicate a lack of credibility on her part or go to the weight of the evidence.**9**

### c. Affidavit

In her affidavit filed at the summary-judgment stage of this case, O'Brien averred the following:

> 6.      Throughout my employment with Defendants, as an opening shift swing manager, I routinely reported to work for Defendants at the North store at 4:30 a.m. on weekdays and Saturdays. And, when I worked on Sundays, I routinely regularly reported to work at 5:30 a.m.
>
> 7.      I was required to report for work at these early times so that I, and other crew members at the North store, could perform necessary tasks to open the restaurant and begin serving food to customers at the time the North store when it [sic] opened to the public.
>
> 8.      These opening job tasks included turning on the lights, turning on the computers, warming up the grills and fryers, turning on and placing drawers in each of the five cash registers and preparing salads, yogurt parfaits and breakfast foods.
>
> 9.      Even though I was required to report to work at 4:30 a.m. during the week, and 5:30 a.m. on Sundays, Mr. Donnelly instructed me not to clock in on the cash register until closer to 5:00 a.m., and 6:00 a.m., on Sundays. And, I followed Mr. Donnelly's instruction in this regard.
>
> 10.      As a result, Defendants' timekeeping records relating to my hours of work do not reflect all of the time that I worked at the North store.

J.A. 330-31.

O'Brien's initial testimony in her deposition in the instant case that she clocked in first before performing other tasks only unambiguously contradicts the last sentence of paragraph 9 of the affidavit — that O'Brien *followed* Donnelly's instruction not to

---

**9**Moreover, in the Seventh Circuit case of *Bank of Illinois v. Allied Signal Safety Restraint Systems*, which defendants and the district court cited, the prior statements that were made under oath in a judicial proceeding were made in a child custody hearing and in responses to interrogatories. *See Bank of Ill.*, 75 F.3d at 1165. That case does not stand for the proposition that testimony in a later portion of a deposition may be disregarded when it conflicts with testimony in an earlier portion of the *same* deposition. *Cf. also Srisavath v. City of Brentwood*, 243 F. App'x. 909, 911-12, 917 (6th Cir. 2007) (cited by plaintiffs at Reply Br. 18).

clock in until a certain time.  But as discussed above, other testimony suggests that, consistent with the affidavit, Donnelly also instructed O'Brien to not clock in until a certain time.  O'Brien never testified at her deposition that Donnelly instructed her to clock in when she arrived.  Indeed, she testified at her deposition that Donnelly did not want her clocking in until closer to 5:00 and only wanted to pay her for an hour.

In short, the deposition testimony in *O'Brien* and *Rogan* did not speak with one voice.  In *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006), we explained that when deciding the admissibility of a post-deposition affidavit at the summary-judgment stage, the district court must first determine whether the affidavit "directly contradicts" prior sworn testimony.  The internal inconsistencies in O'Brien's testimony mean that the affidavit did not directly contradict the prior deposition testimony.  Because there is no direct contradiction, then, the court must not disregard the affidavit, unless the court determines that the affidavit "constitutes an attempt to create a sham fact issue."  *Aerel*, 448 F.3d at 908 (citing *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)).  One of the factors to consider in determining whether the affidavit tries to create a sham fact issue is whether the affiant was cross-examined during earlier testimony.  *Aerel*, 448 F.3d at 909.  This factor matters, because a party who is cross-examined but nevertheless offers unequivocal testimony, only to be contradicted by a later affidavit, has indeed tried to create a sham fact issue.  *See generally Franks*, 796 F.2d at 1237 (citing *Camfield Tires, Inc., v. Michelin Tire Corp.*, 719 F.2d 1361, 1364–65 (8th Cir. 1983) for factors to consider whether sham fact issue exists).  That is not the case here, because "the alleged inconsistency created by the affidavit existed within the deposition itself."  *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980).  The district court should not have disregarded the affidavit.

### d. Summary Judgment

Yet this portion of paragraph 9 of the affidavit is not essential for the Rule 56 analysis:[10] a genuine issue of material fact had already been "raised by the deposition even without consideration of the affidavit." *Kennett-Murray*, 622 F.2d at 894.

The remaining portion of paragraph 9 and a portion of paragraph 7 remain to be considered. O'Brien claims in paragraph 9 that she "was required to report to work at 4:30 a.m. during the week, and 5:30 a.m. on Sundays." This apparently conflicts with O'Brien's deposition testimony, discussed above, that Donnelly "never instructed [her] to come in an hour and a half before the restaurant opened" — nor did Nancy, her manager. To avoid a conflict with this deposition that *would* call for the affidavit to be stricken as an attempt to create a sham dispute of fact, this portion of the affidavit should be read in a limited manner — *i.e.*, that O'Brien "was required" to report to work at those earlier times, but not that Ed Donnelly or Nancy (O'Brien's manager) required her to do so. By interpreting this sentence as O'Brien feeling required — perhaps by what *she* deemed to be the demands of the job—to report early, the affidavit does not conflict with her deposition and is therefore not subject to being stricken. Indeed, her deposition testimony supports such a reading: Donnelly only wanted to pay for an hour of prep time while, according to O'Brien, "you did need more." This reading of this portion of paragraph 9 and of the similar language in paragraph 7 saves them from being stricken, but effectively neutralizes their usefulness for plaintiffs. Nevertheless, the inconsistencies within the *O'Brien* and *Rogan* depositions, when read with the affidavit, reveal a genuine issue of material fact.

The other aspect of the affidavit that should be considered is paragraph 10, which significantly overlaps with plaintiffs' legal claim on which the district court proceeded

---

[10]A district court's order granting summary judgment is reviewed *de novo*. *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). In reviewing a motion for summary judgment, we must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993). When deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Electric Industrial Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

to grant summary judgment to defendants that O'Brien worked "off the clock." Paragraph 10 of the affidavit reads as follows: "As a result, Defendants' timekeeping records relating to my hours of work do not reflect all of the time that I worked at the North store." Though defendants moved for it to be stricken, it is not clear that the court struck it. *See O'Brien*, 2007 WL 4510246, at \*2 (noting that "Defendants ask the Court to strike paragraphs 6-11," but then listing the "at-issue paragraphs" of the O'Brien Affidavit as paragraphs 6-9). We assume it was effectively stricken because the court struck the paragraphs preceding it, on which it explicitly relied.

Striking or disregarding paragraph 10 (to the extent the court did so) and granting summary judgment to defendants on O'Brien's "off the clock" claim was erroneous. Admittedly, a colorable argument can be made that this court should affirm the district court's grant of summary judgment for defendants as to O'Brien's "off the clock" claim notwithstanding our ruling that the district court should not have stricken portions of the O'Brien affidavit. Plaintiffs' FLSA claims are of two varieties: that defendants improperly altered the plaintiffs' time records and that defendants did not pay plaintiffs for time worked "off the clock." As for the latter, O'Brien testified at her deposition as follows:

> Q.    So you clocked in at the time that you came to work and clocked out at the time you left?
> A.    Yes.
> Q.    So *assuming that the computer accurately accepted the information you punched into it and that it wasn't later changed, the computer records would reflect the actual time that you worked?*
> A.    *The computer records would.*

J.A. 208 (O'Brien Dep. 40) (emphasis added). This italicized testimony is damaging to O'Brien's "off the clock" argument. Of course, it is only damaging if one assumes that the computer records were accurate and were not later changed.

Therefore, before we discuss whether the deposition testimony just cited extinguishes plaintiff's off-the-clock theory, we have to discuss the time-sheet–alteration theory. Plaintiffs provide no evidence to support an allegation that the time records were

subsequently altered to O'Brien's detriment. Plaintiffs write in their appellate brief that "[d]iscovery in the case below revealed that, on many occasions, Appellees' managers improperly changed many of the Appellants' recorded hours of work in order to pay them less than they were due." Appellants' Br. 11. They cite multiple sources for this argument — none of which, as far as we can determine, support either O'Brien's or Prater's time-sheet–alteration claim. Moreover, as the district court observed, O'Brien testified at her deposition that she has no personal knowledge whether her time records were altered by Ed Donnelly Enterprises or Ed Donnelly himself — that, aside from being told by her attorney that her time records were altered, she has never heard that her time records had been altered by Ed Donnelly Enterprises. J.A. 211-12 (O'Brien Dep. 50-51). Thus, O'Brien's allegation regarding her time records is unsupported and thus insufficient to survive summary judgment. However, the district court's reconsideration of the spoliation issue may alter its summary-judgment analysis of the alteration claims. Therefore, we vacate the grant of summary judgment.

Returning to the off-the-clock theory: Assuming, then, that the computer was accurate and was not subsequently changed, O'Brien's deposition testimony that the computer records reflected her actual time worked would initially seem to imperil O'Brien's "off the clock" claim. To the extent the subsequent affidavit contradicts this testimony (as paragraph 10 of the affidavit does) it would seem to not have been error to strike it. However, this excerpt of O'Brien's deposition testimony should be read in context. The question preceding this testimony about computer records concerned clocking in: O'Brien answered "Yes" to the question of whether she "clocked in at the time that [she] came to work and clocked out at the time [she] left." *See supra.* Although this is also not helpful testimony for O'Brien, we have already discussed how she later contradicted this testimony in the same deposition, and how the *Rogan* deposition was unclear on this point as well. Thus, the conflicting testimony within the depositions raises a genuine issue of material fact as to the off-the-clock claim which precludes summary judgment for defendants on this theory.

Defendants raise one other argument. According to defendants, even if the affidavit is considered and a factual dispute exists as to whether O'Brien clocked in first or worked first before clocking in, defendant is not liable under the FLSA because there is no evidence that defendants knew that O'Brien was working without compensation. Appellees' Br. at 37. But O'Brien's deposition testimony clearly creates a genuine factual issue, because she asserts that Donnelly knew that she was working off the clock. *See* J.A. 223 line 22 (O'Brien Dep. at 89).

Thus, the district court did not err in granting defendants' motion for summary judgment as to the claim that O'Brien's time records were altered. However, because the district court's ruling on spoliation might create a fact issue as to the alteration claims, we vacate the grant of summary judgment. The district court did err in striking portions of O'Brien's affidavit and thus erred when it granted defendants' motion for summary judgment as to O'Brien's "off the clock" claim.

### 3. Prater

Plaintiffs appeal the district court's decision to strike portions of the affidavit and other documentation filed at the summary-judgment stage by plaintiff Dallas Prater. The district court struck or otherwise disregarded paragraphs 6-9 of the affidavit as inadmissible hearsay; paragraphs 10-13 for violating the Best Evidence Rule; paragraphs 15-16 for being inconsistent with deposition testimony and thus barred by the rule discussed above; and exhibits 6 and 7 and paragraph 14 of the affidavit (which is based on exhibit 7) because the exhibits do not qualify as "pedagogical devices," which is what the plaintiffs argued that they were. *O'Brien*, 2007 WL 4510246, at *4-10. We consider each in turn.

### a. Affidavit ¶¶ 6-9

Paragraphs 6-9 of Prater's affidavit read as follows:

6.      Throughout my employment with Defendants, I often noticed significant discrepancies on my paycheck as compared with the actual number of hours I worked for Defendants.
7.      At the time I worked for Defendants, I wrote down the number of hours I worked in a ledger to compare with my paychecks. And, on at least four occasions, I noticed that my paychecks did not reflect all the hours I had noted working in my ledger.
8.      As a result, I complained to Chad Totche, the restaurant manager at the North store, on at least two occasions about the apparent shortages in my pay.
9.      On those occasions, Mr. Totche told me that he would look into the pay discrepancy and get back to me, or words to that effect. But, Mr. Totche never did follow up with me.

J.A. 333. The district court struck these paragraphs as inadmissible hearsay. *O'Brien*, 2007 WL 4510246, at *5-6. The district court pointed to Prater's testimony, as characterized by the district court, that, "without his ledger, he does not know whether he worked overtime in any given week, and he has no recollection of when he worked on any given day." *Id.* at *5 (citing Prater Dep. 83, 98). The district court also pointed to Prater's testimony that, as the district court put it, "he cannot identify any overtime for which he claims he was not paid without referencing the ledger." *Id.* Thus, the district court concluded, Prater's testimony that he was underpaid "is based entirely on his recollection of the information contained in the personal ledger. In 2003, however, Plaintiff Prater threw away his ledger and pay records. Consequently, Defendants argue that any testimony about the information stated in the ledger amounts to inadmissible hearsay." *Id.* (citations omitted).

The district court agreed with defendants' argument that testimony about the contents of the ledger—beyond the fact that Prater kept a ledger—is inadmissible hearsay and should be stricken. "[T]he Court can consider the statements to show that Plaintiff Prater created a ledger. The Court, however, will disregard Plaintiff Prater's attestations regarding the contents of the ledger." *Id.* at *6.

The district court erred when it disregarded these paragraphs of Prater's affidavit. First, paragraphs 6 and 9 and most of paragraph 8 in Prater's affidavit do not discuss the ledger. Second, the statements in the affidavit are not hearsay. As plaintiffs argue,

> Prater's testimony merely describes the actions he personally took in the past. . . . Prater's affidavit properly describes that he **personally** wrote down the hours he worked in a ledger because he believed Appellees were shorting him hours and wages in his paychecks. Prater's testimony regarding his use of the ledger, which itself is not in evidence because Prater later misplaced it, is not an out of court statement made by someone other than the declarant that is offered for the truth of the matter asserted.

Appellants' Br. 37-38 (citation omitted; emphasis in the original). The affidavit does not purport to introduce the contents of the ledger as evidence. Rather, it shows that Prater kept a ledger (a fact the district court said it could consider; *see supra*), that he "noticed" at least four times that the ledger diverged from his paychecks as to the number of hours worked, and that, "[a]s a result," he complained to Chad Totche. His affidavit provides a foundation for why Prater believes he was cheated by defendants; it might also be used to corroborate or dispute any testimony by Totche. Though the ledger's contents themselves may be inadmissible (for example, to prove that the ledger *actually* diverged from Prater's paychecks), what Prater remembers he noticed in the ledger is admissible for the purposes plaintiffs offer this portion of the affidavit.

Thus, the district court swept too broadly when it declined to consider Prater's "*attestations regarding* the contents of the ledger." *O'Brien*, 2007 WL 4510246, at *6 (emphasis added).

### b. Affidavit ¶¶ 10-13

Paragraphs 10-13 of the Prater affidavit read as follows:

10.     As an opening shift crew member, I routinely reported to work for Defendants at the North store at 4:00 a.m.
11.     When I reported to work at 4:00 a.m., I often times had to wait for an opening shift manger [sic] - including Chad Totche, Angela Tall and David Clark - to arrive at the North store to open the restaurant.

12.     Once an opening shift manager had arrived at the North store, I would begin working right away without clocking in because the opening shift managers told me they would clock me in at 4:00 a.m., which was the time I arrived at the North store.

13.     In this lawsuit, Defendants produced some of my timekeeping records relating to showing the times that restaurant managers clocked me in on Defendants' computer system. However, my beginning work times, as entered by the restaurant managers on Defendants' computer and reflected on Defendants' timekeeping records, are later than the time I usually reported to work for Defendants, which was 4:00 a.m.

J.A. 333-34.

In evaluating these paragraphs, the district court was mindful of Prater's previous deposition testimony—most importantly, it seems, the following colloquy:

Q.     Are you telling me, though, that every time that you worked it was in accordance with the schedule at the restaurant?
A.     Yes.

J.A. 257 (Prater Dep. 73).

Based on this deposition testimony, the district court ruled that paragraphs 10-13 of the affidavit violated the Best Evidence Rule, which states that "[t]o prove the content of a writing . . . , the original writing . . . is required, except as otherwise provided in these rules or by Act of Congress." Fed. R. Evid. 1002. The court acknowledged that plaintiffs correctly pointed out that Rule 1002 does not apply when the proponent of the evidence is not seeking to prove the contents of the writing. The court then characterized plaintiffs' argument as to Rule 1002's application to the instant case:

Plaintiffs conclude that the Rule is inapplicable here because Mr. Prater's testimony is not offered to prove the contents of the schedule, but instead is offered to establish his actual hours of work, and to demonstrate that Defendants' timekeeping records are inaccurate. In other words, Plaintiffs assert that the Prater Affidavit is not disputing the content or accuracy of the schedules, but instead it attests to when Plaintiff Prater reported to work.

*O'Brien*, 2007 WL 4510246, at *7 (citation omitted). The court rejected this argument:

Plaintiffs' argument, however, ignores Plaintiff Prater's prior deposition testimony in which he testified that he always worked in accordance with the written schedules.  If Plaintiff Prater always reported to work in accordance with the written schedules, the best evidence of when Plaintiff Prater reported to work on any given day is in the written schedule for the day.  Consequently, Fed. R. Evid. 1002 operates to bar testimony that Plaintiff Prater's scheduled start time was anything other than what is presented in the written schedules.

*Id.* (citation omitted).

Alternatively, the court ruled that the testimony was barred as inconsistent with Prater's prior deposition testimony:

Plaintiff Prater testified that he always reported to work in accordance with the written schedules.  The written schedules reflect that Plaintiff Prater was never scheduled to begin work at 4:00 am during his first period of employment with Defendants.  Accordingly, Plaintiff Prater's attestations that he routinely reported to work at 4:00 a.m. are inadmissible contradictions of his prior deposition testimony.

*Id*. (citation omitted).

The district court's decision to disregard these paragraphs in the affidavit was error.  First, these averments themselves were not offered to "prove the content of a writing."  By its terms, that is the only time that Rule 1002 applies.  The district court concluded that the averments in the affidavit were deficient because they were not "the best evidence *of when Plaintiff Prater reported to work on any given day*."   *Id.* (emphasis added).  The best evidence to prove that contention may be the schedules, but requiring the best evidence available (here, apparently, the schedules) to prove something besides the "content" of the schedules is not what the Best Evidence Rule demands.  *See Allstate Ins. Co. v. Swann*, 27 F.3d 1539, 1543 (11th Cir. 1994) ("Rule 1002 requires production of an original document only when the proponent of the evidence seeks to prove the content of the writing.  It does not, however, require production of a document simply because the document contains facts that are also testified to by a witness.") (citations and internal quotation marks omitted); *see also Simas v. First Citizens' Fed. Credit Union*, 170 F.3d 37, 51 (1st Cir. 1999) (quoting

*Allstate* for the proposition that "there is no general rule that proof of a fact will be excluded unless its proponent furnishes the best evidence in his power" and reasoning that a plaintiff "can prove he filed a loan application simply through his own trial testimony" and does not need to furnish the application).

Second, this affidavit does not contradict the deposition when the deposition is construed in the light most favorable to plaintiffs, as is required at the summary judgment stage. The questions immediately preceding the colloquy quoted above concerned any "days" that Prater was scheduled to work but did not work, and vice versa. Thus, when read in context, it seems Prater's statement that "every time" that Prater worked he worked in accordance with the schedule was only testimony as to the *days* he worked. By contrast, these paragraphs in the affidavit concern the *hours* that Prater alleges he worked on the days he worked. Thus, there is no contradiction — especially not one that would call for Prater's affidavit to be disregarded. The district court was in error when it ruled otherwise.

### c. Affidavit ¶¶ 15-16

The court granted defendants' motion to strike paragraphs 15 and 16 of the Prater affidavit as being inconsistent with prior deposition testimony. The affidavit states:

> 15.    On approximately nine occasions, I arrived for work at the North store in the morning and was instructed by one of the North store managers that I was needed to work at the South store because it was short staffed. Then, on thee [sic] occasions, I traveled to the South store to work a shift as a grill cook. But, I did not clock in at the South store to record my hours of work.
> 16.    Instead, I was told by the South store managers that one of the North store managers would clock me in and out at the North store. However, none of the records Defendants produced in this lawsuit show any of my work hours at the South store, which averaged ten hours per shift.

J.A. 334. The district court ruled that these paragraphs conflict with Prater's deposition testimony — that, as the district court put it, Prater "admitted that he has no independent recollection of when he worked or of how much time he worked on any given day. He

also admitted that he has no knowledge of ever having worked off the clock at the South store. Finally, Plaintiff Prater testified that he never worked ten hours without pay[.]" *O'Brien*, 2007 WL 4510246, at *8 (citations omitted).

The district court erred. Prater at his deposition answered "Well, yeah" to the question about whether it would be "very hard sitting here today [i.e., at the deposition] for me [i.e., opposing counsel] to ask you particular days of the year back in 2002 how many hours you worked or when you showed up that day, wouldn't it?" J.A. 261 (Prater Dep. 83). Thus, the question was whether it would be "very hard" to *ask* such a question. (Emphasis added.)[11] This question followed a query to which Prater acknowledged he did not know the answer and that it would be "hard to remember," but that query was worded as follows: "And other than that generalized recollection, if I asked you a particular week, like, the first week in November of 2002, do you know whether you worked overtime *that week* from your memory?" *Id.* (emphasis added).

Later in the deposition, the following colloquy occurred:

Q.    And for any of the days that we would go through here in these time punch records, you don't have any independent recollection of when you worked on those days, do you?
A.    No. Not right offhand, no.

J.A. 262 (Prater Dep. 98). First, we note the qualification that Prater does not have any such "independent recollection" "right offhand." This is not a clear admission that Prater has no independent recollection. Second, it is not clear what an "independent recollection" is or why a recollection of events of several years ago that is *not* "independent" would be insufficient. Third, and probably most importantly, the question involves a potential day-by-day inquiry — for each date, Prater would be asked when he worked — but the paragraphs of Prater's affidavit in question do not allege any specific dates. Indeed, the affidavit implicitly acknowledges that Prater does not know

---

[11]Such a reading of the question is far from charitable to defendants, but on summary judgment such a reading is appropriate, as the testimony must be reasonably read in the best light for the nonmovant.

the specific dates, as it states that Prater arrived at the North store and was instructed to go to the South store on "*approximately* nine occasions." (Emphasis added.)

Finally, Prater disputed an exhibit shown to him at his deposition that said he worked 10 hours off the clock on September 18, 2002:

> Q.      Do you have any understanding of why someone would say you worked 10 hours on that day off the clock?
> A.      No, I wasn't working no 10 hours off the clock without getting paid for it. Maybe 5, 10, even 15 minutes, but not 10 hours.

J.A. 269-70 (Prater Dep. 107-08). After a brief discussion off the record, Prater then testified as follows:

> A.      That's why I ain't got no records. That might be when I worked at south store.
> Q.      What do you mean, when you worked at the south store?
> A.      There was times I went down to the south to work for them down there. When I went in they needed – they would call and said they needed somebody down there, so I would go down there and work. And whoever the manager was in charge would say that they would punch us – punch me in, I – because I would ask them if I would wait until I got down there and punch in or what. And they say, no, we'll punch you in here. So, you know, I went on down and worked.

J.A. 270 (Prater Dep. 108). Opposing counsel accused Prater of changing his testimony, but Prater explained:

> A.      Well, because I forgot about me going down to the south store and working.
> Q.      Do you know whether or not you were punched in when you went to the south store to work?
> A.      No, I do not.
> Q.      So you don't know of having ever worked 10 hours off the clock at the south store, do you?
> A.      That's right. I don't mind giving them a few minutes, but ten hours, not [sic].

J.A. 271 (Prater Dep. 109).

Here, Prater is testifying in the present tense: as of his deposition, he does not know whether someone else punched him in when he went to the South store and whether he worked off the clock at the South store for ten hours. Such testimony is admittedly not helpful for plaintiffs' case. But the affidavit does not contradict this testimony — paragraph 16 of the affidavit only says that "none of the records Defendants produced in this lawsuit" show any of his work hours at the South store. In other words, Prater may not personally know whether he was punched in, but he could still discern whether the records produced by the defendants reflect the hours that he asserts he worked. Moreover, paragraphs 15 and 16 are consistent with Prater's deposition testimony explaining needing to go down to the South store, that he would not punch in himself, and that he was told that a North store manager would clock him in at the North store. The district court's characterization that "Prater *alleges in his affidavit* that he is claiming he worked ten-hour days without pay at the South store" (*O'Brien*, 2007 WL 4510246, at *8 (emphasis added; citing paragraph 16 of affidavit)) is technically erroneous.

For all these reasons, the district court erred when it struck these paragraphs in the Prater affidavit.

### d. Affidavit ¶ 14; Exhibits 6 and 7

The district court disregarded plaintiffs' exhibits 6 and 7, and thus paragraph 14 of Prater's affidavit which was based on exhibit 7, because the exhibits do not qualify as "pedagogical devices" as defined by *United States v. Bray*, 139 F.3d 1104, 1111 (6th Cir. 1998),[12] which is what the plaintiffs claimed they are.[13] The court found that the

---

[12]This court understands a "pedagogical device" to be:

an illustrative aid such as information presented on a chalkboard, flip chart, or drawing, and the like, that (1) is used to summarize or illustrate evidence, such as documents, recordings, or trial testimony, that has been admitted in evidence; (2) is itself not admitted into evidence; and (3) may reflect to some extent, through captions or other organizational devices or descriptions, the inferences and conclusions drawn from the underlying evidence by the summary's proponent. This type of exhibit is "'more akin to argument than evidence' since [it] organize[s] the jury's examination of testimony and documents already admitted in evidence." Trial courts have discretionary authority to permit counsel to employ such pedagogical-device "summaries" to clarify and simplify complex testimony or other information and evidence or to assist counsel in the

portions of the exhibits that were based on portions of plaintiffs' affidavits that the court already found to be inadmissible were themselves inadmissible. The court also observed that "the exhibits are not accurate representations of the evidence." *O'Brien*, 2007 WL 4510246, at *10.

Since these exhibits are pedagogical devices and are not *themselves* evidence, it does not matter whether the district court considered them or not. Any decision by a district court to strike or otherwise not consider a "pedagogical device" at the summary-judgment stage would be, at most, harmless error. A pedagogical device is not evidence. On a motion for summary judgment, such a device is offered merely to "aid" the court. If a district judge — for whatever reason — believes that a pedagogical device would not help him or her to rule on a motion for summary judgment, such a device is, by definition, useless.[14]

### e. Summary judgment

Plaintiffs articulate two theories of recovery: that plaintiffs' time records were changed to their detriment and that plaintiffs worked "off the clock." The first theory fails as to Prater, and the district court was not in error when it entered summary judgment for defendants as to that claim. Prater has testified that managers would "fix[]" the time-in and time-out when necessary, but he was not aware of any such changes being inaccurate. *See* J.A. 256 (Prater Dep. 67); *see also* J.A. 268 (Prater Dep.

---

presentation of argument to the court or jury.
*Bray*, 139 F.3d at 1111 (internal citations omitted).

[13]Although plaintiffs initially state in their brief that their "damage calculations are proper *evidence* under Fed. R. Civ. P. 56(c)," they then go on to argue that their "damage calculations are *not evidence themselves*, but are the consolidation of evidence adduced from relevant and admissible evidence already presented to the district court in this case. Therefore, Appellants' damage calculations are proper *pedagogical devices* that should have been considered by the district court." Appellants' Br. 42, 45 (emphasis added).

[14]Note that this discussion is restricted to a court's consideration of a motion for summary judgment and other proceedings in which there is no jury present to consider evidence. A district court does not have license to keep any pedagogical device it wishes from a jury's eyes. *Cf. Bray*, 139 F.3d at 1111 (noting that trial courts have "discretionary authority" to permit the use of such devices). Furthermore, note the obvious limit that a district court does not have license to disregard whatever *evidence* it wants to. We are only discussing "pedagogical devices" characterized as such by the party that brings them before the court.

106).  He also testified that he has no knowledge of anyone intentionally altering his hourly time records or anyone else's hourly time records.  J.A. 274 (Prater Dep. 141); *see also* J.A. 258 (Prater Dep. 77).  As stated, though, we vacate the district court's grant of summary judgment, because the spoliation issue remains open for the district court to consider on remand.

However, given the evidentiary rulings above, the district court erred when it granted defendants' motion for summary judgment as to Prater's "off the clock" claim. We reverse and remand.

### 4.  Burden of proof

Plaintiffs raise another argument on appeal, which the district court did not discuss in its opinion, but which pertains to our decision to affirm the grant of summary judgment on some of plaintiffs' claims.  To begin with, a "FLSA plaintiff must prove by a preponderance of evidence that he or she 'performed work for which he [or she] was not properly compensated.'" *Myers v. Copper Cellar Corp.*, 192 F.3d 546, 551 (6th Cir. 1999) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946), *superseded by statute on other grounds as stated in Carter v. Panama Canal Co.*, 463 F.2d 1289, 1293 (D.C. Cir. 1972)).  To determine the extent of damages, the plaintiff can "prove his or her 'under-compensation' damages through discovery and analysis of the employer's code-mandated records. However, if the employer kept inaccurate or inadequate records, the plaintiff's *burden of proof is relaxed*,  and, upon satisfaction of that relaxed burden, the onus shifts to the employer to negate the employee's inferential damage estimate." *Id.* (emphasis added) (citing *Mt. Clemens Pottery*, 328 U.S. at 687–88).

Plaintiffs imply that their claims should not have been dismissed on summary judgment because they only needed to satisfy this lesser initial burden, as the defendants' records were inaccurate and inadequate.  However, *Mt. Clemens Pottery* and its progeny do not lessen the standard of proof for showing that a FLSA violation occurred.  Rather, *Mt. Clemens Pottery* gives a FLSA plaintiff an easier way to show what his or her

damages are. When an employer keeps inaccurate or inadequate records, for a FLSA plaintiff to show what his or her damages were, a FLSA plaintiff does not need to prove every minute of uncompensated work. Rather, she can estimate her damages, shifting the burden to the employer. If the employer cannot negate the estimate, then the "court may award damages to the employee, even though the result be only approximate." *Mt. Clemens Pottery*, 328 U.S. at 688. In short, *Mt. Clemens Pottery* does not help plaintiffs show that there was a violation under the FLSA. It would only allow them to prove damages by way of estimate, if they had already established liability. Plaintiffs' failure to show a genuine issue of material fact as to the time-sheet–alterations claims required the district court's entry of summary judgment against them, though as discussed, the grant of summary judgment is vacated for the district court to revisit the spoliation issue.

*V. Conclusion*

We reverse the district court's rulings with regard to the affidavits presented by the lead plaintiffs on summary judgment. And we vacate the entry of summary judgment against plaintiffs on the time-sheet–alteration claims, because we have also remanded for the district court's consideration whether sanctions for spoliation are warranted. This may alter the merits of the summary-judgment analysis of the lead plaintiffs' time-sheet–alteration claims.

The district court's decertification of the collective action in *O'Brien* is affirmed. Regarding *Dellarussiani*, the entry of judgment in plaintiffs' favor due to mootness, as well as the entry of summary judgment in defendants' favor are affirmed, with the exception that the issue of the attorney fees awarded in *Dellarussiani* is remanded to the district court.

Accordingly, the district court is AFFIRMED IN PART and REVERSED IN PART. Defendants' motion to dismiss the *Dellarussiani* plaintiffs from the *O'Brien* appeal is GRANTED IN PART, but DENIED IN PART as to the Prompt Pay Act and common-law claims. These cases are REMANDED for further proceedings consistent with this opinion.

_____

**CONCURRING IN PART**
_____

WHITE, Circuit Judge, concurring in part.  I concur in the majority opinion except with regard to its determination that the *Dellarussiani* plaintiffs' common-law claims in *O'Brien* are necessarily barred by res judicata.  I would leave such a determination to the district court on remand.