NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0630n.06

No. 20-1236

## UNITED STATES COURTS OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Nov 05, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| TENLEY MCLAUGHLIN GOOD | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| BIOLIFE PLASMA SERVICES, L.P.; SHIRE | ) | COURT FOR THE EASTERN |
| PHARMACEUTICALS aka SHIRE US, INC., | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

BEFORE:    MERRITT, MOORE, and GIBBONS, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge.    Tenley Good, a twenty-year-old college student, decided to donate plasma at BioLife Plasma Services.  When she arrived at BioLife's facility, she checked in with the receptionist, chatted with a phlebotomist, and then went to see a "medical historian," who was charged with pricking Good's finger with a small needle to obtain a capillary sample.  The medical historian pricked Good's finger with the needle, and Good remembers thinking "oh no" before the world went black.  The medical historian tried to keep Good's limp body from falling, but the chair that Good was sitting in swiveled, and she fell head-first onto the ground.  She was rushed from the BioLife facility in an ambulance, and she claims to have suffered severe injuries because of her fall.  This incident was the first time that Good had been seriously injured donating blood or plasma, but it was not the first time she had passed out

during the process. In fact, she had a long history of becoming light-headed and fainting while attempting to donate blood.

Good sued BioLife and its parent company, Shire US, Inc., for negligence, claiming that they breached a duty of care toward her in two ways. First, Good claims that BioLife should have asked about her prior experiences donating blood before collecting her capillary sample so that BioLife's employees would have been aware of the risk that she might faint. Second, Good claims that the chair that BioLife provided during the capillary sample procedure was unsafe because it was tall, swiveled, and had no restraints. BioLife moved for summary judgment, and the district court granted the motion as to both of Good's theories of liability. For the reasons discussed below, we reverse the district court's grant of summary judgment on both theories and remand for further proceedings consistent with this opinion.

## I.

Since she was a child, Good has become light-headed or fainted at the sight of blood. Despite her aversion to the sight of blood, Good donated blood five times between the ages of sixteen and twenty because "[s]he felt it was a way she was giving back. . . . [S]he thought it mattered." DE 32-5, V. McLaughlin Dep., PageID 2164.

These donations did not always go smoothly. The first time that Good attempted to donate blood, she fainted when the nurse pricked her finger to take a capillary sample. Then, the next year, Good made it through the capillary sample process but fainted during the donation. According to her mother, she also got dizzy during another donation attempt at a local ice rink.

In 2015, one of Good's classmates persuaded Good to donate blood plasma at BioLife Plasma Services, L.P. When Good arrived at BioLife to donate, she filled out a form, showed her ID to the receptionist, and had her fingerprint taken. The receptionist then created a Donor

Identification Form (DIF) that listed Good's demographic information and showed that Good "voluntarily consent[ed] to the withdrawal of [her] blood for the purpose of laboratory testing." DE 53-4, DIF Form, PageID 6553.

After a new donor completes the intake process, a phlebotomist conducts a vein check. The phlebotomist inspects both of the potential donor's arms to determine whether her veins are suitable for donation. The phlebotomist also typically asks the potential donor whether she has donated blood or plasma in the past, and if so, whether she has had any adverse reactions to those prior donations. If the potential donor indicates that she has had prior adverse reactions, she is sent to a nurse who may decide that she is not eligible to donate. The phlebotomist then notes the completed vein check on the DIF but does not specifically note whether the phlebotomist asked the potential donor about her donation history.

The phlebotomist who conducted Good's vein check was Julida Griffin Reeves. Reeves has no independent memory of conducting Good's vein check, but she testified that she recognized her writing on the DIF confirming that the vein check took place. She also testified that it was her habit to always ask donors about their donation history during the vein check.

During her deposition, Good stated that she did not remember anyone conducting a "vein check" or anyone "sort of looking at [her] arms and [her] wrists and [her] skin to see whether [her] veins were in good enough shape to donate plasma." DE 46-7, Good Dep., PageID 4936–37. But she conceded that a vein check may have happened and that she does not remember because her "memory at that moment is not great." *Id.* at 4937.

While Good cannot dispute that Reeves conducted a vein check, she does dispute Reeves's contention that she asked Good about her donation history during that vein check. In an affidavit filed after depositions were completed, Good stated that "[d]uring the time" she was at BioLife

"no person inquired of [her] as to any prior adverse reactions to any type of blood draw or donation, or the sight of blood. DE 77-12, Good Aff., PageID 8335. Similarly, "no questions were posed to [her] in any format as to prior adverse reactions to any type of blood draw or donation or the sight of blood." *Id.* In her earlier deposition, Good agreed that she had never "talk[ed] to any of [the BioLife employees] about having passed out previously when donating blood or when seeing blood," but her affidavit was the first time that she explicitly stated that no BioLife employees had asked her about her donation history. DE 46-7, Good Dep., PageID 4939.

After the vein check, Good went to see Sylvia Roberts, the medical historian responsible for taking her capillary sample. While the medical historian takes a donor's capillary sample, the donor is seated at a "high" counter in a "bar chair" with a backrest that has arms on the side and swivels. DE 46-10, Roberts Dep., PageID 5108–09. The medical historian stands across the counter. Once the donor is seated, the medical historian cleans the donor's finger and then pricks that finger with a small needle to obtain a blood sample. The historians are trained to inform the donor that a capillary sample will be taken, but they do not give the donor notice immediately before the finger prick takes place. If there is an adverse reaction, such as someone getting dizzy, lightheaded, or fainting, the historians are trained to call for a nurse and keep their hands around the donor to prevent her from falling.

In this case, Good fainted almost immediately after Roberts pricked her finger. Good's head went down on the counter, and Roberts attempted to catch her, but Good's weight shifted, the chair swiveled, and Good fell. She was taken from BioLife in an ambulance.

Good claims that she suffered significant injuries stemming from this fall. After the fall, she remained in the hospital for a week, she continued vomiting for another week after her release, and she suffered from post-concussive syndrome. Her injuries caused her to miss a month of

school and work and required numerous doctors' visits. She has also suffered from headaches, dizziness, vertigo, anxiety, decreased hand dexterity, and some loss of hearing in one ear in the years since the fall.

Good filed suit in Michigan state court against BioLife and its parent company, Shire US, Inc., alleging that BioLife had acted negligently.[1] BioLife removed the case to federal court under 28 U.S.C. §§ 1332, 1441. After the close of discovery, both parties moved for summary judgment. The district court granted BioLife's motion because it concluded that no reasonable jury could find that BioLife failed to act with reasonable care. Good timely appealed.

**II.**

This court reviews the grant of summary judgment *de novo*. *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012). "Summary judgment is appropriate only when the evidence, taken in the light most favorable to the nonmoving party, establishes that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "A genuine issue of material fact exists when there are 'disputes over facts that might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Summary judgment is not proper "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

**III.**

Under Michigan law, a negligence claim has four elements: duty, breach, causation, and damages. *Case v. Consumers Power Co.*, 615 N.W.2d 17, 20 (Mich. 2000); *see also K & T Enters. v. Zurich Ins. Co.*, 97 F.3d 171, 176 (6th Cir. 1996) ("[S]tate law provides the substantive

---

[1] Good also brought a claim for medical malpractice that she later voluntarily dismissed.

law governing diversity cases." (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). Good claims that BioLife owed her a duty to use reasonable care and that BioLife breached that duty in two ways, causing her fall from the chair. First, she claims that BioLife should have asked about her prior experiences donating blood before pricking her finger so that BioLife would have been aware of the risk that she might faint and could have taken further precautions. Second, she claims that the chair BioLife provided during the finger prick was unsafe because it was tall, swiveled, and had no restraints. We refer to her first theory as the "negligent failure to take history" theory and her second theory as the "negligent positioning" theory.

The district court concluded that BioLife owed Good a duty to use reasonable care. However, it also concluded that no reasonable jury could find that BioLife breached that duty under either of Good's theories. While we agree with the district court that BioLife owed Good a duty, we disagree with its conclusion that no reasonable jury could find that BioLife breached that duty. BioLife argues that even if the district court's conclusion on the issue of breach was erroneous, we can still affirm the district court's ruling on the ground that BioLife's negligence did not cause Good's injuries or that Good assumed the risk of an injury. Because we find neither of these arguments persuasive, we reverse the district court's grant of summary judgment to BioLife.

A.

The first issue we must address is whether BioLife owed Good a duty. "Whether a defendant owed a plaintiff a duty of care is a question of law for the court." *Beaudrie v. Henderson*, 631 N.W.2d 308, 311 (Mich. 2001). In Michigan, every person or entity "who attempts to do anything . . . for another" has a "duty to exercise some degree of care and skill in the performance of what he has undertaken." *Hart v. Ludwig*, 79 N.W.2d 895, 898 (Mich. 1956) (quoting 38 Am.

Jur. *Negligence* § 17). BioLife made the decision to open a plasma donation center. Therefore, it had a duty to use "reasonable care" while operating that center. *See Buczkowski v. McKay*, 490 N.W.2d 330, 332 (Mich. 1992) ("[T]he standard of care . . . in negligence cases is always reasonable conduct.").

BioLife advances two arguments in support of its contention that it did not owe Good a duty to use reasonable care, but neither are convincing. First, BioLife argues that it had no duty of any kind because this case involved "nonfeasance" not "misfeasance." In other words, BioLife believes that it owed Good no duty because, according to BioLife, Good's claims stem from BioLife's failure to act (nonfeasance) instead of its affirmative actions (misfeasance). *See Williams v. Cunningham Drug Stores, Inc.*, 418 N.W.2d 381, 382–83 (Mich. 1988) (noting there is no duty to take affirmative actions to "actively protect others from harm"). Contrary to BioLife's assertion, however, Good does not claim that BioLife was negligent because it failed to act to protect her from harm. Rather, her claim is based on a BioLife employee's affirmative act of pricking Good's finger. BioLife had a duty to ensure that this finger prick, as an affirmative act, was conducted with reasonable care. Whether reasonable care required BioLife to take Good's medical history or place her in a different chair before conducting this finger prick is a question of breach, not duty. *See* Mich. Civ. Jury Instr. 10.02 ("The law does not say what a reasonably careful person using ordinary care would or would not do under [the] circumstances. That is for [the jury] to decide."). Therefore, to the extent that we can rely on a distinction between misfeasance and nonfeasance,[2] BioLife was not engaged in nonfeasance.

---

[2] The Michigan Supreme Court has cautioned against relying on a distinction between misfeasance and nonfeasance in determining whether a duty exists because it is "often largely semantic[,] somewhat artificial," and has a tendency to "obscure[] the proper initial inquiry: Whether a particular defendant owes any duty at all to a particular plaintiff." *Fultz v. Union-Commerce Assocs.*, 683 N.W.2d 587, 591–92 (Mich. 2004).

Second, BioLife argues that even if there was a duty, the duty was based on premises liability law, not general negligence. A premises liability claim involves harm arising out of a dangerous condition on the defendant's property. *Pugno v. Blue Harvest Farms*, *LLC*, 930 N.W.2d 393, 401–02 (Mich. Ct. App. 2018). While Good's negligent positioning claim may, at first blush, resemble a premises liability claim, her claim is not that the chair BioLife provided, in and of itself, presented a dangerous condition. *Cf. id.* (finding that premises liability governed when the claim involved pallets of cardboard that "were simply a condition of the premises"). Instead, she claims that BioLife's decision to prick her finger while she was seated in that chair was negligent. *See* CA6 R.20, Reply Br., at 27 ("The negligent-positioning claim arises from *Defendants*' choice to *place* [Good] in a specific chair and then puncture her skin to collect some amount of blood."). That is a general negligence claim, not a premises liability claim.

Finding that BioLife owed Good a duty to use reasonable care is consistent with the Michigan Supreme Court's guidance that courts should find that a duty exists when "'social policy justifies' its imposition." *Dyer v. Trachtman*, 679 N.W.2d 311, 314 (Mich. 2004) (quoting W. PAGE KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 56, at 374 (5th ed. 1984)). To determine whether social policy justifies imposing a duty, Michigan courts primarily consider "the relationship of the parties, [and] the foreseeability of the harm." *Id.* (quoting *Murdock v. Higgins,* 559 N.W.2d 639, 642 (Mich. 1997)).[3] Given that BioLife saw approximately 100,000 donors per year, BioLife was in a better position than Good to understand the risks of plasma donation and protect against those risks. *See Schultz*, 506 N.W.2d at 178 ("It is well established that those who

---

[3] Michigan courts also nominally consider the "burden on the defendant and the nature of the risk presented," but these factors tend to be given significantly less weight than the relationship between the parties and the foreseeability of harm. *See, e.g.*, *Schultz v. Consumers Power Co.*, 506 N.W.2d 175, 178 (Mich. 1993) (considering only relationship and foreseeability); *Hill v. Sears, Roebuck & Co.*, 822 N.W.2d 190, 201 (Mich. 2012) (same); *Buczkowski*, 490 N.W.2d at 334 (same). We therefore focus our analysis on the relationship of the parties and the foreseeability of harm.

undertake particular activities . . . assume a distinctive duty to procure knowledge and experience regarding that activity.").  And the foreseeability of the risk of harm to Good was demonstrated by BioLife's own training procedures, its expert's testimony, and the testimony of its employees.  For these reasons, considerations of social policy justify finding that BioLife owed Good a duty to use reasonable care.

B.

Given our conclusion that BioLife owed Good a duty of reasonable care, the next question is whether BioLife is entitled to summary judgment on the issue of breach.  Ordinarily, breach is an issue for the factfinder. *See Case*, 615 N.W.2d at 21 ("The terms 'ordinary care,' 'reasonable prudence,' and such like terms . . . cannot be arbitrarily defined. . . . The policy of the law has relegated the determination of such questions to the jury." (quoting *Grand Trunk Ry. Co. v. Ives*, 144 U.S. 408, 417 (1892))); *see also Detroit & Milwaukee R.R. Co. v. Van Steinburg*, 17 Mich. 99, 121 (1868) ("[W]hat constitutes negligence in a particular case is generally a question for the jury, and not for the court[.]" (quoting *N. Pa. R.R. Co. v. Heilman*, 49 Pa. 60, 63 (1865))).

On the negligent failure to take history theory, BioLife is not entitled to summary judgment because there is a genuine dispute of material fact: namely, a dispute over whether BioLife asked Good about her prior donation history.  On the negligent positioning theory, BioLife is not entitled to summary judgment because a reasonable factfinder could conclude that BioLife did not act with the care that a "reasonably careful person would use under the circumstances."  *See Case*, 615 N.W.2d at 20.  Therefore, BioLife is not entitled to summary judgment on the issue of breach.

1.

The district court concluded that there was no genuine dispute of material fact on the negligent failure to take history theory by erroneously excluding Good's affidavit. In that affidavit,

Good stated that "no questions were posed to [her] in any format as to prior adverse reactions to any type of blood draw or donation or the sight of blood." DE 77-12, Good Aff., PageID 8335. That statement is in conflict with facility manger Katie Pietrzak's testimony that donors were typically asked about their prior donation history during the vein check, which would have occurred before Good's finger was pricked. It is also in conflict with the testimony of Julida Griffin Reeves, the employee who conducted Good's vein check, that it was Reeves's "habit" to always ask potential donors about their donation history during the vein check. Therefore, if Good's affidavit can be considered, there is a dispute of fact as to whether BioLife asked Good about her prior donation history.

The district court excluded Good's affidavit under the "sham affidavit" rule because it believed that Good's affidavit conflicted with her prior deposition testimony. We review that decision for abuse of discretion, *Reich v. City of Elizabethtown*, *Ky.*, 945 F.3d 968, 975 (6th Cir. 2019), which is "defined as a definite and firm conviction that the trial court committed a clear error of judgment." *Burrell v. Henderson*, 434 F.3d 826, 831 (6th Cir. 2006) (quoting *Amernational Indus., Inc. v. Action-Tungsram, Inc.*, 925 F.2d 970, 975 (6th Cir. 1991)). Given that there was no "direct contradiction" between Good's affidavit and her deposition testimony, nor any evidence that Good's affidavit constituted an attempt to create a sham fact issue, we hold that the district court abused its discretion in excluding Good's affidavit. *See Reich*, 945 F.3d at 976.

In her affidavit, Good claimed that "no questions were posed to [her] in any format as to prior adverse reactions to any type of blood draw or donation or the sight of blood." DE 77-12, Good Aff., PageID 8335. The district court believed that this statement contradicted Good's earlier testimony that she "d[id] not recall" having her veins checked at BioLife and that her "memory at

that moment [was] not great." DE 91, Op. & Order, PageID 8884; *see* DE 46-7, Good Dep., PageID 4936–37. The district court reasoned that because Good's memory was "not great," she could not have forgotten the vein check while remembering not being asked about her donation history.

This conclusion was clearly erroneous because the statement in Good's affidavit and the statement in her deposition were not contradictory. *See Briggs v. Potter*, 463 F.3d 507, 513 (6th Cir. 2006) (noting that courts should apply a "relatively narrow definition of contradiction"). It is entirely plausible that Good both does not remember getting a vein check *and* remembers never telling anyone about her donation history. Simply because she does not remember a BioLife employee "looking at [her] arms and [her] wrists and [her] skin to see whether [her] veins were in good enough shape to donate plasma," DE 46-7, Good Dep., PageID 4936–37, does not necessarily mean that she would not remember what questions she was asked during her time at BioLife. *See Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 833 (6th Cir. 1999) (reversing a district court's decision to exclude an affidavit under the sham affidavit rule when the affidavit merely "expound[ed] upon" the deposition testimony).

Additionally, Good's affidavit was not the first time she claimed that she had not discussed her history of fainting with the employees at BioLife. During her deposition, Good stated that she had never talked to anyone at BioLife "about having passed out previously when donating blood or seeing blood." DE 46-7, Good Dep., PageID 4939. While that statement is not identical to the statements in her affidavit, it is at least consistent with them. *See O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 593 (6th Cir. 2009) (concluding that a district court should not apply the sham affidavit rule when "the alleged inconsistency created by the affidavit existed within the deposition itself" (quoting *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980))), *abrogated on other grounds by Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016). And given that Good was

never asked during her deposition whether any BioLife employees had inquired into her donation history, we cannot hold her failure to volunteer that information against her. *Briggs*, 463 F.3d at 513 (holding that an affidavit should not have been excluded, even though the declarant had been "questioned generally" about the relevant issue during a deposition, because the declarant "was not expressly asked" about it and "was not under any obligation to volunteer" that information).

Therefore, we conclude that the district court abused its discretion by excluding Good's affidavit. When Good's affidavit is considered, there is a genuine dispute of material fact as to whether BioLife asked about Good's donation history prior to taking her capillary sample, and summary judgment is not appropriate on this theory.

2.

On the negligent positioning theory, the district court concluded that no reasonable jury could find that BioLife's choice of chair was negligent because "the probability of Plaintiff's event was so unlikely that failing to anticipate it was [not] a breach of the standard of care." DE 91, Op. & Order, PageID 8887. That conclusion was improper because the district court weighed the evidence and assumed the role of the factfinder. Had the harm to Good been entirely unforeseeable, the district court's grant of summary judgment would have been proper. *Cf. Duvall v. Goldin*, 362 N.W.2d 275, 279 (Mich. Ct. App. 1984) (finding that the likelihood of harm was not entirely unforeseeable and so the moving party was not entitled to summary judgment). But this case does not present those facts.

BioLife staffers acknowledged that there was a risk of harm to prospective donors during the capillary sample. In response to the question "did you ever see anybody pass out, get lightheaded, dizzy, become unstable with the finger poke," a former BioLife nurse stated that she

had seen it "[a] couple of times."[4]  DE 46-6, Parks Dep., PageID 4842.  Another employee, Susan

Weatherhead, stated that she had seen people get lightheaded during the finger poke in the past,

and, although she had not seen anyone "hit the floor," she indicated that employees were "all

trained to step up behind the donor and keep hands around them . . . to keep it from going that far."

DE 49-8, Weatherhead Dep., PageID 5958.  And Pietrzak, the manager of the BioLife donation

center, admitted that adverse reactions to a capillary sample were a "known potential risk."  DE

46-11, Pietrzak Dep., PageID 5156.

Further, BioLife's expert never claimed that the risk of someone fainting during a capillary

sample was non-existent.  She pegged the risk at somewhere below 0.1 percent.  Given that BioLife

sees around 100,000 donors every year, a reasonable factfinder could conclude that the risk of

someone fainting during a capillary sample was high enough that BioLife should have provided a

safer chair.  In fact, based on BioLife's expert's numbers, BioLife could expect somewhere less

than 100 people to faint each year.  While this is a small percentage of the total donors, the number

is certainly sufficient to make fainting a foreseeable possible consequence of a finger prick.

Good also argues that the district court should have considered the testimony of her experts,

Nancy Erickson and Sean Stanley, that fainting during a capillary sample was a "recognized

phenomenon."  *See* DE 32-13, Erickson R., PageID 2221; DE 32-14, Stanley Rep., PageID 2226.

The district court excluded these experts' opinions because it concluded that they were not

"qualified to assess the medical risk that donors might faint when furnishing a capillary sample."

DE 91, Op. & Order, PageID 8886.  We review the exclusion of expert testimony for abuse of

discretion.  *See Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 676 (6th Cir. 2011).  But "rejection of

---

[4] The parties dispute the relevance of this statement.  BioLife argues that it is of limited relevance because Parks did not identify which of those reactions she had seen with specificity.  But taking this evidence in the light most favorable to Good, as this court must, a reasonable factfinder could conclude that there were negative reactions to the finger prick up to, and including, someone fainting.

expert testimony is the exception, rather than the rule," *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendments), and on these facts, the district court abused its discretion by concluding that Good's experts were not qualified.

The district court provided no analysis to support its conclusion that these experts were unqualified. Instead, it listed their qualifications—which included 34 combined years of experience in related fields and extensive practical knowledge—and then disqualified them in one sentence. The district court did not conduct a *Daubert* hearing, nor did it provide any explanation as to why Erickson—who was on a committee tasked with establishing standards for how to safely take capillary samples—and Stanley—a director of phlebotomy centers who trained staff members—would be unlikely to "help the trier of fact" in determining how often people faint while their capillary samples are being taken. *See* Fed. R. Evid. 702. Given that the district court failed to justify its decision to exclude these witnesses, we hold that their exclusion constituted an abuse of discretion.[5]

When all of this evidence is considered together, a reasonable factfinder could conclude that BioLife should have provided Good with a different chair given the foreseeable risk of harm to donors during the capillary sample process. The district court's grant of summary judgment on the negligent positioning theory was, therefore, erroneous.

---

[5] The district court based its decision to exclude the experts on their qualifications, not whether their conclusions were based on "sufficient facts or data" or "reliable principles and methods." *See* Fed. R. Evid. 702; *see also Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 380 (6th Cir. 2014) (Stranch, J., concurring) (noting that whether an expert is qualified and whether an expert's testimony is reliable are two different steps of the process for admission). We take no position on whether, after a proper *Daubert* hearing, the witnesses' conclusions could be excluded on those grounds.

C.

BioLife argues that causation presents an alternative basis for affirming the district court's grant of summary judgment. Determining whether a breach "caused" a plaintiff's injuries, involves two separate inquiries: (1) whether the breach was the "but for" cause of the injury, and (2) whether the breach was the proximate ("legal") cause of the injury. *Skinner v. Square D Co.*, 516 N.W.2d 475, 479 (Mich. 1994). Biolife claims that Good's negligent failure to take history theory fails as a matter of proximate cause and that Good's negligent positioning theory fails as a matter of "but for" cause. We disagree.

1.

Proximate cause does not provide an alternative basis for affirming the district court's grant of summary judgment on the negligent failure to take history theory. "Proximate cause normally involves examining the foreseeability of consequences and whether a defendant should be held legally responsible for them." *Lockridge v. Oakwood Hosp.*, 777 N.W.2d 511, 516 (Mich. Ct. App. 2009) (citing *Skinner*, 516 N.W.2d at 479). "The determination of remoteness . . . should seldom, if ever, be summarily determined." *Id.* (alteration in original) (quoting *Davis v. Thornton*, 180 N.W.2d 11, 16 (Mich. 1970)). BioLife argues that its failure to take Good's donation history could not have been a proximate cause of her injuries because "[t]he law in Michigan is clear that a defendant's alleged failure to provide information about a risk cannot be the proximate cause of injury when the risk was known to the plaintiff." CA6 R.18, Appellee Br., at 59. To support this argument, BioLife cites two federal cases applying Michigan law: *Ferlito v. Johnson & Johnson Prods., Inc.*, 771 F. Supp. 196 (E.D. Mich. 1991) and *Vroman v. Sears, Roebuck & Co.*, 387 F.2d 732 (6th Cir. 1967). Both *Ferlito* and *Vroman* are products liability cases dealing with a defendant's alleged failure to warn. In failure to warn cases, plaintiffs must show that they would

have been "dissuaded . . . from using the product in the manner that they did" if the defendants had provided a warning. *Ferlito*, 771 F. Supp. at 200. In essence, they must show that their own conduct would have been different if the defendants had provided a warning.

Unlike a plaintiff in a failure to warn case, Good is not required to make such a showing because she is not claiming that her own conduct would have changed had BioLife asked for her donation history. Instead, she claims that BioLife's behavior would have changed had it learned about her history. And Pietrzak has already confirmed that BioLife would have changed its behavior and not allowed Good to donate had it been aware of Good's donation history. What Good knew about her own history of fainting is, therefore, irrelevant to the issue of proximate cause. Given that a reasonable jury could find that the harm to Good was foreseeable to BioLife, *see supra* Section III.B.2, proximate cause does not provide an alternative ground for affirming the district court.

2.

Similarly, but-for causation does not provide an alternative basis for affirming the district court's grant of summary judgment on the negligent positioning theory. Although a court may grant summary judgment on the issue of but-for causation, it is ordinarily a question for the jury. *Genna v. Jackson*, 781 N.W.2d 124, 128 (Mich. Ct. App. 2009). Only "when the matter remains one of pure speculation and conjecture" or "there is no issue of material fact," may the court decide the question. *Id.; Holton v. A+ Ins. Assocs., Inc.*, 661 N.W.2d 248, 253 (Mich. Ct. App. 2003).

Sylvia Roberts, the medical historian who took Good's capillary sample, provided an account of what happened once Good fainted. She said:

> I tried to catch her and I planted myself and there was a lot of people there donor
> wise and I didn't want to scream out. I just was going like, "Help, help," 'cause all

> the stations were full, trying – I did not want her head to hit the floor. So she shifted weight and the chair turned. I still tried to grab her but was unsuccessful.

DE 46-10, Roberts Dep., PageID 5122.

Taking this testimony in the light most favorable to Good, as this court must, a reasonable factfinder could conclude that the chair's swivel caused Good to fall. Roberts explicitly stated that the chair turned when Good's weight shifted and that Roberts was unable to successfully prevent Good from falling. Stanley, one of Good's excluded experts, also testified that "the fact that the chair swiveled" caused Good's injuries. DE 46-16, Stanley Dep., PageID 5462–63. Roberts's statement and Stanley's conclusion take the question of "but for causation" out of the realm of "pure speculation or conjecture," and into the hands of the factfinder. *See Genna*, 781 N.W.2d at 128. For that reason, but-for causation does not provide an alternative basis for affirming the district court's conclusion.

### D.

BioLife's final argument is that an alternative ground for affirming the district court's grant of summary judgment is that Good's claim is barred by the doctrine of primary assumption of the risk. Assumption of the risk, as noted by the district court, has been largely eliminated in Michigan. *Felgner v. Anderson*, 133 N.W.2d 136, 153 (Mich. 1965). It continues to exist only in cases involving employment relationships, express contractual agreements, *id.*, and some voluntary recreational activities, *see e.g.*, *Ritchie-Gamester v. City of Berkley*, 597 N.W.2d 517, 523–24 (Mich. 1999).

BioLife argues that its relationship with Good was similar to that of an employer and independent contractor. Even if BioLife and Good had such a relationship, assumption of the risk would not apply. As the Michigan Supreme Court has emphasized, an employee (or independent contractor) cannot "assume[] the risk . . . of dangers *negligently created by his employer*." *Felgner*,

133 N.W.2d at 146 (emphasis added); *see also e.g.*, *id.* at 141–142 ("[A] master is not liable to a servant for the neglect of his fellow-servants . . . . He is only liable where his own personal neglect has directly contributed to the injury, or where he has not used ordinary diligence in employing competent servants." (quoting *Mich. Cent. R.R. Co. v. Leahey*, 10 Mich. 193, 199 (1862)); *id.* at 149 (discussing cases in which the doctrine of assumption of the risk was improperly used "not to limit the defendant's liability for other than his own negligence, but rather to relieve a defendant of the legal consequences of his own negligent acts."). Otherwise, assumption of the risk would operate as a mere "substitute for . . . contributory negligence." *Id.* at 153–54. Good is pursuing a claim based on "dangers negligently created by [BioLife,]" and BioLife is attempting to use the doctrine of assumption of the risk as a "substitute for . . . contributory negligence." *See id.* at 146, 153–54.[6] Therefore, assumption of the risk does not apply in this case.

## IV.

BioLife owed Good a duty to use reasonable care while conducting the new donor screening process and pricking her finger. A reasonable jury could find that BioLife breached that duty and that BioLife's breach caused Good's injuries. Therefore, we reverse the district court's grant of summary judgment to BioLife.

---

[6] In fact, contributory negligence does not bar recovery in Michigan. MICH. COMP. LAWS § 600.2958 (2020). Michigan is a comparative fault state, § 600.2958, and invoking assumption of the risk cannot turn a fact question into a legal one. Certainly, a jury may consider Good's failure to volunteer her history, which was extensive and well-known to Good, in evaluating comparative fault. But any lack of reasonable care in failing to tell BioLife about her history cannot amount to assumption of the risk under Michigan law.